**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

- - - - - - - - - - - - - - - - - - - - - - - - - -

JOHN DOE,

          Plaintiff

    vs.

SYRACUSE UNIVERSITY,
SYRACUSE UNIVERSITY BOARD OF
TRUSTEES, SHEILA JOHNSON-
WILLIS, in her individual capacity, AND
BERNERD JACOBSON, in his
individual capacity,

          Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - -

Civil Case No. ___5:19-cv-190 (BKS/ATB)

**COMPLAINT AND JURY DEMAND**

## I. INTRODUCTION

1.    Plaintiff John Doe brings this civil action under Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681, et seq. ("Title IX"), under the New York State Constitution, Art. I, § 6 for breach of due process rights, and under common-law theories of breach of contract, negligence, and other related claims.

2.    Plaintiff seeks to recover from Defendants Syracuse University and Syracuse University Board of Trustees (collectively, "Syracuse") as well as from individual Defendants Bernerd Jacobson ("Investigator Jacobson") and Sheila Johnson-Willis ("Chief Title IX Officer Johnson-Willis") for their willfully biased and recklessly discriminatory investigation and adjudication of a sexual misconduct complaint against John Doe. Defendants expelled John Doe after discriminating against him on the basis of sex, among other willful, negligent acts.

3.    John Doe's wrongful expulsion followed a biased investigation and proceeding in which Syracuse found him "responsible"—the equivalent of "guilty" in a criminal proceeding—

1

for the alleged rape of a female student ("RP") after the Syracuse Police declined to prosecute or investigate further.[1]

4.      RP and John Doe's sexual intercourse arose out of fully consensual, repeated encounters between the two students.  Moreover, they had sex entirely off campus, and their relationship had no effect on campus events.  After two prior consensual sexual encounters, RP first alleged that "nothing" was consensual about a sexual encounter on November 13, 2016; but on that day, RP voluntarily drove herself to John Doe's apartment, where they had sex after attending church.

5.      John Doe denies that any sexual acts with RP were nonconsensual.  The case came down to his version of events versus RP's say-so.  But whereas John Doe's account of events has remained consistent, RP changed her story repeatedly as Syracuse investigated.  After RP first insisted that she did not consent to *any* sexual acts on November 13, 2016, she later conceded that some acts were, in fact, consensual.  On the other hand, after previously admitting that her prior encounters with John Doe (on October 11 and October 24, 2016) had been entirely consensual, she later alleged that John Doe had attempted vaginal rape on October 24, 2016.

6.      Syracuse rejected a mass of RP's allegations as untrue.  Syracuse maintains a quasi-judiciary composed of a University Conduct Board ("UCB"), full-time investigators, and victims' advocates.  In its written decision, the UCB rejected RP's allegation that John Doe attempted vaginal rape on October 24, 2016.  It also rejected her assertion that nothing she did with John Doe on November 13, 2016 had been consensual.  The UCB did not believe that RP refused to kiss or move into John Doe's bedroom, among other sex acts.

---

[1] RP stands for "reporting party," the term used for alleged victims who report sexual misconduct (in the jargon of Title IX proceedings).  The initials bear no relationship to this woman's name and are intended to protect her privacy given the sensitive details set forth in this Complaint.  As alleged in this Complaint, RP did not bring the Syracuse Title IX complaint against John Doe and was not, in this strict sense, the "reporting party."

7.     Syracuse correctly rejected these false allegations yet nevertheless contradicted itself.  Its official decision stated unequivocally that RP *was* credible.  Inexplicably, the UCB credited RP's claim that she did not consent to vaginal intercourse—but only on the occasion of November 13, 2016—while correctly disregarding her claim of attempted non-consensual vaginal intercourse of October 24, 2016.

8.     Throughout the investigation and adjudication of John Doe's case, Defendants violated federal law, violated the New York State Constitution, and disregarded Syracuse's own policies.  Defendants' illegal and wrongful acts include, without limitation:

i.      Failing to provide John Doe with the complaint against him: John Doe has never received a copy of Syracuse's complaint;

ii.     Issuing a secret "No Contact Order," applying only to John Doe, without notice to John Doe;

iii.    Placing a "victims' advocate" in charge of its investigation, who conducted a biased inquiry of facts that favored the female victim at the expense of the accused male student;

iv.     Delaying proceedings against John Doe without cause and without written justification;

v.      Failing to provide John Doe the right to cross examine RP or other witnesses and refusal to allow John Doe to call witnesses in his support. Indeed, the UCB denied John Doe the right to know what RP said against him at hearing.

vi.     Prejudging John Doe by presuming him responsible for rape;

vii.    Applying archaic gender stereotypes of male sexual desire: Defendants found that John Doe's admission of sexual desire for RP was equivalent to admitting of premeditated rape;

viii.   Applying equally archaic stereotypes of passive female victimhood; and

ix.     Failing to provide John Doe with an unbiased tribunal: John Doe came before a UCB crusading against supposed male "rape culture."

9.     Syracuse's discriminatory and erroneous expulsion has not only blighted John Doe's education, future income, and earning capacity; John Doe has also been branded a rapist and is now emotionally and psychologically devastated.

## II.   PARTIES

10.     John Doe is a natural person who resides in Avon, Connecticut.  From 2016-April 2017 he was a student in the Masters program of Defendant Syracuse University's Forensic & National Security Sciences Institute.

11.     Defendant Syracuse University ("Syracuse") is a private institution of higher education that receives federal funding.  Syracuse is located in Syracuse, New York.

12.     Defendant Syracuse Board of Trustees ("Syracuse Board") currently has 45 voting members and is responsible for making rules, codes of conduct, policies, and regulations that govern Syracuse.  Its principal place of operations is 900 S. Crouse Avenue, 602 Crouse-Hinds Hall, Syracuse, New York.

13.     Sheila Johnson-Willis is a resident of the State of New York and was Interim Chief of Syracuse's Equal Opportunity and Title IX Officer ("Chief Title IX Officer Johnson-Willis") at all times relevant to this Complaint.

14.     Bernerd Jacobson ("Investigator Jacobson") is a resident of the State of New York and was the Syracuse Title IX Investigator responsible for John Doe's case at all times relevant to this Complaint.

## III.   JURISDICTION AND VENUE

15.     This Court has jurisdiction under 28 U.S.C. § 1331 and under 28 U.S.C. § 1367(a) because Plaintiff's cause of action arises under Title IX, a law of the United States.  This Court has supplemental jurisdiction over all state court claims under 28 U.S.C. § 1367(b).

4

16.     This Court also has jurisdiction under 28 U.S. Code § 1332(a) because there is complete diversity.  John Doe is a resident of Connecticut whereas all Defendants reside in New York State.  The amount in controversy exceeds $75,000.

17.     Venue is proper in the Federal District Court for the Northern District of New York under 28 U.S.C. § 1391(b) because Defendants reside within the jurisdiction of this Court, and a substantial part of the acts and omissions giving rise to Plaintiff's claims took place within the jurisdiction of this Court.

## IV.   FACTS

### A.  Plaintiff and RP's Consensual Relationship

18.     Plaintiff John Doe is originally from Avon, Connecticut, and RP is from Torrington, Connecticut.  He and RP attended the same church, Valley Community Baptist Church.  They met each other prior to attending Syracuse.  John Doe has been an active participant and service volunteer in the community, including but not limited to the Lakeside Christian Youth Camp, missions work, and community outreach.

19.     At the time of the alleged incident, Plaintiff John Doe was 23 years old and had just graduated from Liberty University in Lynchburg, Virginia with a BS in Biology and minors in Chemistry and Psychology.  He served as a student leader at Liberty and as a Student Spiritual Life Coach on campus.

20.     John Doe has an impeccable reputation.  Throughout his life, he has never had any disciplinary actions against him until Syracuse's wrongful, erroneous sexual misconduct proceeding.  Throughout his academic career from grade school through high school and as a student at Liberty University (which imposes a strict Christian code of conduct), John Doe was never accused of wrongdoing.  He was never the object of disciplinary action.

21.     In Fall 2016, John Doe enrolled in the Masters Program at Syracuse's Forensic & National Security Sciences Institute in Forensic Science.  His goal was to pursue his dream career in forensic investigations.  He worked diligently and with academic honors.  His graduate work included cross-disciplinary research with the Syracuse Biology Department.

22.     Although the alleged incident occurred and was reported in November 2016, Syracuse dragged out its final decision to expel John Doe until May 2017, when he had only one more remaining class and was only awaiting his research results to finish his last degree requirements.  The timing could not have been more damaging to John Doe.  Although he still received recommendations from staff and professors when Syracuse erroneously and wrongfully expelled him in the Spring of 2017, he was forever barred from completing his degree.

23.     RP is three years John Doe's senior.  She was pursuing a Masters Degree in Social Work at Syracuse.  Having met at church in their home state, they looked forward to meeting socially at school when they realized they were both attending Syracuse.

24.     RP and John Doe shared a deep commitment to their Christian faith and values. They discussed their common belief systems and attended the same church, the North Syracuse Baptist Church.

25.     In August 2016, when arriving in Syracuse to begin their respective educations, they began spending time together on a regular basis.  They attended Syracuse football games, played volleyball, went to the mall together, and took time to get to know each other.  They went to church together and shared intimate details of their personal lives and ambitions.  They began to meet weekly in the evening for meals, conversation, shopping, and other activities.

26.     A mutual attraction developed based on both physical desire and shared values, yet in Fall 2016, each was dating someone else.  As RP and John Doe's relationship evolved,

6

balancing their mutual attraction, their commitments to others, and their Christian values became increasingly conflicted.  Neither party had extensive sexual experience.  At the time they began spending time together, both RP and John Doe disclosed to the other that they were still virgins.  Both RP and John Doe had resolved to remain abstinent until marriage and remined committed to that resolution.

   *1)  First Encounter of Tuesday, October 11, 2016*

   27.    On Tuesday, October 11, 2016, John Doe left class at approximately 7:45 PM.  As had become customary, he gave RP a quick call to ask if she wanted to "hang out."  RP stated she would like to get together with John Doe.  She later divulged that her current boyfriend had broken up with her.  John Doe and RP decided to go out for sushi at the Destiny Mall.  John Doe listened as RP discussed her personal problems.

   28.    After eating, RP continued to seek support from John Doe and asked to go to his apartment where she continued to talk. John Doe continued to listen to RP.  As they sat on the couch, RP looked for physical as well as emotional comfort.  The two had their arms around each other and eventually began to kiss.  RP continued to kiss him.

   29.    The physical connection continued by RP getting on top of John Doe.  The encounter progressed to mutual fondling and they agreed to move into John Doe's bedroom.  They mutually agreed to remove each other's clothing as evidenced by their simultaneous actions and desires.  John Doe picked her up and carried her, and she demonstrated her active participation by wrapping her legs around John Doe's waist.  As the sexual encounter progressed, John Doe asked for and received verbal consent from RP as well as nonverbal cues indicating her affirmation of their encounter.  RP was an active, willing and assertive participant. John Doe and RP attempted vaginal intercourse but without success.

7

30.     After this encounter, John Doe felt conflicted, and RP stated she still had feelings for her recent ex-boyfriend.  They also discussed how they both believed their encounter had violated their Christian values.

31.     John Doe also regretted that he was in a relationship with another woman.  He told RP that he was upset by how their actions would affect his other relationship.  John Doe felt such emotional anguish that RP offered to take him to the hospital.  He refused this assistance, but that night he sought professional support independent of RP.

32.     RP and John Doe's further sexual encounters developed in the same pattern, and each encounter demonstrated RP's affirmative consent at every stage in their sexual behavior. They also discussed their mutual desire to maintain their Christian morality and were confused over their physical desire and sexuality.

2)  *Second Encounter of Monday, October 24, 2016*

33.     During the two weeks after their first encounter, John Doe and RP continued to struggle with feelings of guilt.  John Doe was convinced it was appropriate to confess to his current girlfriend.  His relationship with his girlfriend ended as a result of the confession.  John Doe continued independently to seek emotional support during this time from a Christian Counselor.

34.     RP and John Doe continued to have feelings for each other.  When they talked on multiple occasions, they discussed whether or not they should avoid "hanging out" to ward off the temptation of another sexual encounter.  By the weekend of October 22/23, 2016, John Doe and RP discussed the effect of their behavior on their relationship and expressed that they would each seek forgiveness as they were taught by their Christian upbringing and values.

35.     On October 24, 2016, they met again, a meeting John Doe originally arranged at a coffee shop.  RP initially agreed to the public location, but instead, RP voluntarily drove to John

Doe's apartment around 5:00 p.m. and went into John Doe's apartment. John Doe discussed his feelings about his break up and about his Christian values. In addition, he had just discovered someone had broken into his car and stolen his laptop and backpack.

36.     The two agreed to stay at John Doe's apartment to talk, and soon they both began to be intimate, which again evolved into a sexual encounter. Their consensual sexual behavior followed the same pattern as the previous encounter. They began to kiss each other. They agreed through their actions and words to move to John Doe's bedroom. The mutuality of this event was evidenced by John Doe picking RP up while she actively wrapped her legs and arms around John Doe. They continued various sexual behaviors that they both enjoyed and desired to continue. It is undisputed that they attempted vaginal intercourse during this second encounter, but again without success.

37.     As with the previous encounter on October 11, 2016, John Doe asked for and received affirmative consent to each act throughout their sexual behavior.

38.     RP gave affirmative consent to each specific sexual act, both verbally when asked and through affirmative actions (such as mounting John Doe, reaching for his genitals, "grinding" on John Doe's genitals—among other affirmative and assertive behavior). It is equally important that, when RP appeared not to enjoy an act to which she had consented, John Doe stopped. The couple would then move on to other consensual acts.

39.     For example, at one point during their second sexual encounter, RP appeared not to enjoy performing oral sex (although it is undisputed that she gave consent and actively participated in this act). Constantly being attentive to RP's cues and feelings, John Doe noticed her discomfort immediately. They talked about it, and John Doe asked her to stop. They stopped and transitioned to other sexual acts, to which RP affirmatively consented and had no

physical, emotional, or verbal discomfort.  She gave no negative expression to their ongoing

encounter.  At no time was this encounter ever forceful by either party or non-consensual.

40.     Inexplicably and without legal basis or reason, Syracuse later used the fact that

John Doe listened to all cues given by RP as evidence against him.  Syracuse erroneously used

evidence that John Doe stopped specific sexual activity when given any slight cue by RP as

evidence that RP had given no consent to any sex thereafter.  Syracuse selectively enforced this

unrealistic interpretation of consent by ignoring that it was John Doe who first requested that RP

stop performing oral sex on him.  According to Syracuse, men cannot irrevocably withdraw

consent by asking a woman to stop, but once a female withdraws consent to a specific act,

consent cannot be voluntarily re-given for any subsequent act.

41.     After the second encounter, John Doe and RP once again felt conflicted by their

Christian values and their sexual desire.  The two also discussed RP's unstable and unpredictable

relationship with another man, which increased her feelings of her wrongdoings during their

sexual encounters.  They discussed their need to avoid temptation and follow their Christian

values, so they again decided that it would be best if they stayed away from each other.  That

evening, John Doe again felt remorse for their behavior and again sought support and help from

a professional counselor.  He continued to seek the support of his Christian counselor.  At all

times, John Doe sought professional assistance to cope with his emotions regarding these issues.

3) *Third Encounter of Sunday, November 13, 2017 Follows the Exact Same Pattern as Previous Encounters*

42.     John Doe and RP engaged in a third encounter that followed the exact same

pattern as the first two encounters.

43.     On November 13, 2016, John Doe went to church in Syracuse and saw RP when

he walked in.  RP continued talking to John Doe and stated she had no money for lunch, and so

John Doe invited her to have lunch at his apartment after church.  RP responded that she would like to.  She later gave contradictory accounts: she denied wanting to come to John Doe's apartment even though she voluntarily drove her own car.  Syracuse, however, never asked RP about these contradictions.  These contradictions were not even considered during the investigation, hearing, or appeal process.

44.     Once inside John Doe's apartment, they began to kiss on John Doe's couch.  This was intentional by both parties as evidenced by stopping the kissing to eat, having conversation, and then resuming kissing after eating.  Throughout this time, RP was an active and willing participant, and both parties mutually participated in the sexual behavior.  As they had on prior occasions and with mutual consent, John Doe and RP moved to his bedroom.  RP again actively wrapped her legs around John Doe as he carried her to the bedroom.  They removed each other's clothing and progressed to mutual fondling.  John Doe was attentive to RP's desires and cues.  John Doe, being conscious of RP's feelings and desires, asked RP if she wanted to stop "making out."  She said yes, so John Doe immediately stopped his actions.  As he had before, when RP said no, John Doe understood "no" to mean "no" and respected her statement.

45.     RP remained next to him and began flirtatiously teasing him and touching him.  John Doe responded to her and kissed her, and she responded by kissing him back and fully and actively participated in the physical contact.  John Doe was cognizant that they were acting on mutual desires that they may both later regret.  RP said, "not to worry about it"; and she said that it "didn't bother" her that they were in a similar situation as their other two encounters.

46.     After she made those statements, John Doe asked if they could "make out" again, and RP agreed and consented to kissing again.  The encounter progressed beyond making out just as it had on the other two occasions.  They mutually began undressing each other.  At no

time during this encounter was there any pressure, any force, or any involuntary action of either party.

47.     John Doe asked if he and RP could again attempt vaginal sex, as they had attempted unsuccessfully on the two previous occasions.  She consented, agreed, and continued to engage in the sexual behavior.  On this occasion, the two successfully completed vaginal intercourse.

48.     John Doe performed all sexual acts with RP's affirmative consent and RP performed all sexual acts with John Doe's consent.  John Doe halted specific acts when RP gave cues, verbal or physical, to stop.  The two only continued when both mutually and affirmatively consented to continue sexual behavior after each hiatus.  All sexual acts occurred within the exact same pattern of voluntary, mutually consensual sex as in their prior encounters.

49.     After the fact, both John Doe and RP talked about feeling remorse about their mutual desires, completing the sexual act, and conflict with their faith.  RP also stated that she was conflicted due to her attempt to commit again to her other boyfriend.  She also stated to John Doe that she was upset that she may not be a virgin anymore and expressed confusion about this point.  They again agreed not to see each other to avoid temptation.  They then turned to small talk.  RP did, however, express to John Doe that she was "fine" and "ok with the situation."

50.     However, after time passed, RP met with a Syracuse professor and RP decided to report that John Doe had sexually assaulted her.  She alleged that *no* sexual contact during the day of November 13, 2016 had been consensual.  Although she made this claim, there is and was no evidence of her engaging in or obtaining medical assistance or any physical exam.  Nor was there any report or witness of any actual trauma on her part on that day or at any time after the

incident.  On information and belief, Syracuse's representatives unduly influenced RP to recast her experience as sexual assault after the fact.

### B. Public and Government Pressure on Syracuse

51.      At the precise time of RP and John Doe's sexual encounters, Syracuse faced substantial criticism for allegedly looking the other way when female students complained of sexual assault as well as not actively prosecuting alleged male perpetrators.  The pressure came from multiple sources, including, but not limited to its student body, the media, and federal and state government.  For example, there were mass demonstrations in Fall 2016 within the student body accusing Syracuse of tolerating a male "rape culture."

52.      At this time, Colleges and Universities, including Syracuse, feared being investigated or sanctioned by the Department of Education's Office for Civil Rights ("OCR") for violating Title IX.  They also feared lawsuits brought by alleged female victims of sexual assault and complaints to the OCR and Department of Justice ("DOJ").  The head of the OCR, Assistant Secretary of Education Catherine E. Lhamon (known for her former career as an aggressive litigator with the Los Angeles ACLU) was quoted in the LA Times stating, "We don't treat rape and sexual assault as seriously as we should, . . . [There is] a need to push the country forward." David G. Savage and Timothy M. Phelps, *How a little-known education office has forced far-reaching changes to campus sex assault investigations*, LA Times (August 17, 2015).

53.      Lhamon told a national conference at Dartmouth in the summer of 2014, "I am prepared to withhold federal funds" from universities.  *How Campus Sexual Assaults Came To Command New Attention*, NPR (August 12, 2014).

54.      The federal government created significant pressure on Syracuse (and other universities) to treat male students accused of sexual misconduct with a presumption of guilt. The Chronicle of Higher Education noted, "Colleges face increasing pressure from survivors and

the federal government to improve the campus climate." *Presumed Guilty: College men accused of rape say the scales are tipped against them,* Chronicle of Higher Education (September 1, 2014) (available at https://www.chronicle.com/article/Presumed-Guilty/148529).  The Chronicle noted that colleges and universities had begun to apply different standards to men and women: "Under current interpretations of colleges' legal responsibilities, if a female student alleges sexual assault by a male student after heavy drinking, he may be suspended or expelled, even if she appeared to be a willing participant and never said no.  That is because in heterosexual cases, colleges typically see the male student as the one physically able to initiate sex, and therefore responsible for gaining the woman's consent."  As the Chronicle observed, this broad-based movement applied archaic gender stereotypes of male sexual drive, on the one hand, and the passive victimhood of female students, on the other.

55.     In direct response to pressure from the OCR and other organizations, government bodies, and officials, Syracuse curtailed the procedural protections afforded to male students such as John Doe in sexual misconduct cases.  This is not political speculation or a conclusory allegation.  The Association of Title IX Administrators ("ATIXA"), which trains more university Title IX administrators than any other organization, published a "2014 Whitepaper" entitled "Equity is Such a Lonely Word."  The Whitepaper includes training materials presented to college Title IX departments, and it states: "victims have historically been accorded 3/5 of the rights of an accused individual (or less), and victims are typically women, equity may require institutions to recalibrate the pendulum to right the historical imbalance."

56.     The movement to press Syracuse to address a supposed male "rape culture" grew out of these kinds of OCR threats and training materials, but it was also a social movement to curtail due process rights.  Sixteen professors of the University of Pennsylvania Law School

14

objected, "All the universities are being stampeded to go along [with] improper pressure upon universities to adopt procedures that do not afford fundamental fairness."  LA Times (August 17, 2015) (quoting professor Stephanos Bibas).

57.     The pressure was palpable at Syracuse.  In September 2014, students, faculty and staff gathered on the steps of Hendricks Chapel at Syracuse to protest sexual assault policies. "The protest concluded with about 50 advocates storming the chancellor's office and slapping him with [a] petition," which boasted "8,000 signatures and 700 comments requesting the establishment of a new [victim advocacy] facility."[2]  Paige Carlotti, *'Rally For Consent' protest aims to alter sexual assault resources at Syracuse*, USA Today (September 19, 2014).

58.     In November 2014, an organization called "THE General Body," a collective of student organizations, spent close to three weeks occupying the Syracuse administration building. Among the demands from THE General Body were increased attention to the issue of sexual assault. The reform of Syracuse's supposed male "rape culture" was central to this agenda.  A student leader of the movement, Laura Cohen, spoke on behalf of THE General Body:

> Syracuse University, as well as most other universities, has a culture of rape. Rape culture means that in certain spaces, rape and sexual assault is pervasive and normalized due to our attitudes about gender and sexuality. This culture includes sexual objectification, victim-blaming, and the denial of rape and sexual assault as a real issue. When one in four college women report surviving rape or attempted rape at some point in their lifetime, there can no longer be a refusal to acknowledge the harm of sexual violence on this campus, and we need better systems in place to combat this.

Press release, "We Still Do Not Have a Safe Space" (available at

https://thegeneralbody.org/tag/rape-culture/).  THE General Body, deploying inflated statistics known to be inaccurate by Defendants at the time, among other inaccuracies, demanded

---

[2] The petition can be found here: https://www.change.org/p/syracuse-university-reinstatement-of-the-advocacy-center-to-provide-confidential-sexual-assault-support-services-at-syracuse-university.  Its supporters posted comments such as "rape is not a 'mental illness."

increased protection for female victims of sexual assault and demanded stepped up prosecution of alleged male perpetrators.

59.     As used at Syracuse, "rape culture" is inherently gender-based.  Advocates who target "rape culture" refer to male perpetrators; and, as Ms. Cohen pointed out in her own advocacy, they refer to female victims.  There is no female "rape culture."  Stamping out "rape culture" means targeting the male student body.

60.     A document outlining communications between THE General Body and the administration demonstrates the significant focus on campus sexual assault.  THE General Body, Compiled Responses (available at https://thegeneralbodydotorg.files.wordpress.com/2014/11/compiled_grievances_needs_responses_11_12.pdf).  It also clearly outlines the Syracuse administration's knowledge of and sensitivity to these criticisms.  These communications contain specific personal criticism of the Syracuse Title IX Coordinator for her role in prior matters where the University supposedly did not take female students' complaints seriously enough or act upon them.  The students demanded that Syracuse prioritize victims' advocacy and commit to "ending" the perceived "rape culture"--invariably identified as exclusively male.  THE General Body, Compiled Responses at 36.

61.     In December 2014, Syracuse received a report from the Chancellor's Workgroup on Sexual Violence Prevention, Education, and Advocacy (available at http://inclusion.syr.edu/wp-content/uploads/2016/12/Workgroup-Final-Report-Dec-2014.pdf).  The purpose of the Workgroup was to identify critical gaps in services and support for victims and survivors of sexual and relationship violence on campus.  The Workgroup set out to prevent sexual assault at Syracuse by the male student body: "The discourse on campus about sexual assault and

relationship violence typically focuses on male-on-female violence involving students who are fulltime undergraduates, White, and heterosexual." (*See* Report at 5.)

62.     Syracuse also received national attention as a result of a September 2015 CNBC report titled, "One of the most dangerous places for women in America," which identified a "rape crises" (available at https://www.cnbc.com/2015/09/22/college-rape-crisis-in-america-under-fire.html).  The report described an incident with a Syracuse student that occurred in 2012 in which an alleged sexual assault never led to criminal charges.  The article also quoted a Boston University student, who stated, "Schools like to pretend that there isn't a rape culture problem and that they are a very caring university."  *Id.*

63.     By 2014/2015, immediately prior to the accusations against John Doe, Syracuse became determined to highlight that it was a true "caring university," committed to ending its perceived male "rape culture."  Syracuse's administrators and its Title IX office were sensitive to criticism of their sexual assault policies and their own perceived deficiencies accommodating female victims.  In all Syracuse's attempts to change its growing reputation, Defendants identified a "rape culture" as exclusively associated with men, and they identified female students exclusively as the victims of "rape culture."

64.     The extreme pressure to reform its approach to sexual assault policies encouraged Syracuse's decision-makers and its investigators to favor victims' advocacy in support of female students who come forward with accusations.  It also shifted presumptions in favor of believing women and in favor of presuming accused male students responsible for sexual assault.  These presumptions resulted in policies that allowed for less evidence, improper investigations, and cursory, biased review of the facts, all resulting in less legal protection for the alleged male perpetrator and more opportunity for false accusation and unfair punishment.

65.     The pressure motivated Syracuse to protect its reputation and motivated its administrators to protect their positions.  Defendants strove to demonstrate that Syracuse would do anything to support female students who alleged sexual assault.

66.     On information and belief, in the case of RP and other women who came forward in the 2016/2017 timeframe, Syracuse's willingness to accept uncritically female's accusations of sexual assault reached a zenith.  Syracuse was eager and overly enthusiastic to demonstrate to the student body and the public that it was serious about quashing a supposed male "rape culture" on campus.  Syracuse investigators, its hearing panels, and administrators adopted a bias in favor of the accusing female student and against the accused male student to quell criticism that Syracuse had turned a blind eye to alleged assaults by men.

67.     Pressure continued to mount on Syracuse to curtail due process in order to strike a blow against male "rape culture."  In October 2016, students dragged mattresses covered with messages in red tape to protest Syracuse's alleged "rape culture."  According to news reports, "Students took turns standing or sitting with mattresses on the quad.  The mattresses were marked up with red tape that read 'rapists go here [i.e., Syracuse],' 'survivor,' and 'I can hear your silence.'"  *SU students protest handling of sexual assault cases with mattresses, red tape,* Syracuse University News (October 4, 2016) (available at: http://www.syracuse.com/su-news/index.ssf/2016/10/su_students_protest_handling_o.html).

68.     The demonstration was inspired by a similar protest at Columbia University, in which students objected to a Columbia decision finding a male student ***not*** responsible (multiple times) for allegations of sexual assault after affording him due process and a full evidentiary

hearing.[3]  One message the demonstrators  attempted to convey was that due process was an

impediment to protecting alleged female victims.  The protesters, including approximately 50

faculty members, described Syracuse as an "institution that lets perpetrators walk free while

survivors, activists, and our families must bear the injustice silently."  *Students hold red tape*

*demonstration against sexual assault*, Daily Orange (October 4, 2016) (available at:

http://dailyorange.com/2016/10/students-hold-red-tape-demonstration-sexual-assault/).

69.     Also in 2016 and immediately prior to Syracuse' initiation of its investigation

against John Doe, Syracuse responded to at least two OCR investigations, each of which carried

the threat of cutting off Syracuse's federal funding:

> On June 22, 2016 OCR notified Syracuse that OCR was investigating an allegation that Syracuse failed to respond "promptly and equitably" to a "report of sexual assault." OCR Docket # 02-16-2168.

> On January 17, 2016, OCR notified Syracuse that OCR was investigating a first allegation that Syracuse failed to respond "promptly and equitably" to a "report of sexual assault." OCR Docket # 02-16-2323.[4]

70.     The pressure and fear at Syracuse reached an all-time high as their federal funding

appeared in jeopardy.  As a result of the above-mentioned investigations, OCR demanded

significant amounts of data and information from Syracuse.  OCR attorneys also scheduled a

visit to Syracuse on January 24, 2017.  *See Feds to visit Syracuse University as part of sexual*

*assault procedures investigation* Syracuse University News (January 13, 2017) (available at

---

[3] The Court may take judicial notice of the Columbia episode, which resulted in multiple decisions of the Southern District of New York after the male student sued Columbia University in defamation and Title IX, among other theories.  See e.g. *Nungesser v. Columbia University*, 169 F.Supp. 3d 353 (2016); Emily Bazelon, Have We Learned Anything from the Columbia Rape Case? New York Times Magazine (May 29, 2015) (available at https://www.nytimes.com/2015/05/29/magazine/have-we-learned-anything-from-the-columbia-rape-case.html).
[4] Although the letter is dated January 17, 2016, Plaintiff believes that the actual date of the OCR letter was 2017 based on the August 2016 date of the complaint referenced in the letter and contemporaneous media reporting.  On information and belief, in February 2017, the graduate student at the center of the second OCR investigation withdrew the complaint and the OCR closed the second investigation.

https://www.syracuse.com/su-news/index.ssf/2017/01/feds_to_visit_syracuse_

univers.html).

71.    The January 24, 2017 visit from OCR focused on a complaint alleging that

Syracuse was not acting promptly enough when it received notice of female students' allegations

of sexual assault.

72.    According to a news report, Syracuse administrators emphasize their efforts to

appease the OCR.  "Campus officials said they have taken 'significant' steps in recent years to

prevent sexual and relationship violence."  *Id*.  The OCR also held a public discussion in Schine

Student Center on January 24, 2017 and January 25, 2017.  *See* announcement at

https://news.syr.edu/wp-content/uploads/2017/01/F_G_-Flier_updated.pdf

73.    During the Syracuse visit, OCR attorneys asked students and faculty for their

opinions of Syracuse's response to sexual assault and discrimination allegations.  *Office for Civil*

*Rights attorneys hold first of 2 meetings on Title IX investigation at* SU, Daily Orange (January

24, 2017) (available at: http://dailyorange.com/2017/01/office-for-civil-rights-attorneys-hold-

first-of-two-meetings-on-title-ix-investigation-at-su/).

74.    Syracuse initiated its Title IX Complaint against John Doe the day OCR came to

campus on January 24, 2017.  This was over two months after the incident was reported and after

the Syracuse Police Department completed its investigation and closed the file.  Syracuse saw no

need to take action on RP's allegation of sexual assault.  The case had been dormant since

November 15, 2016.  On information and belief, Syracuse began its investigation and initiated

the Title IX Complaint against John Doe the day after the OCR visit in response to public and

governmental pressure to extirpate the so-called "rape culture" among Syracuse male students.

### C.  The Gender Bias of Syracuse's Title IX Office

75.     Syracuse's Title IX Office instituted gender biased policies and procedures due to the atmosphere of student protests, media attention, and governmental pressure.  Furthermore, Syracuse appointed administrators and staff who furthered this bias, as manifested in the investigation, hearing, decision, and appeal of John Doe's case.  Syracuse officials were acting out their own biases.

### 1)  Carrie Grogan Abbott

76.     For example, Carrie Grogan Abbott, the chair of John Doe's Hearing Board, had been official censor of the student TV station, HillTV.  *See HillTV content ignites communitywide discussion*, The Daily Orange (October 19, 2005) (available at http://dailyorange.com/2005/10/hilltv-content-ignites-community-wide-discussion/).  During Abbott's tenure as station censor, Syracuse closed HillTV in response to complaints that a comedy show it had aired promoted male "rape culture."  Students and faculty complained that the show (called *Over the Hill*, only one show among many aired by HillTV) portrayed sensitive topics in a way that adversely affected women on campus.  *See Syracuse University head shuts down student TV station*, FIRE (October 27, 2005) (available at https://www.thefire.org/media-coverage/syracuse-university-head-shuts-down-student-tv-station/).  Syracuse punished all students at HillTV by closing the station as a whole, although the alleged offensive content was limited to one show.  *Id.*  The hasty, blanket closure of HillTV showed that Syracuse (and Abbott) would not hesitate to sideline due process and take action when it perceived such offenses.

77.     HillTV demonstrated that "most of the [Syracuse] community has been raised in a culture that builds the message that racism, sexism and rape are all right," according to Joan Gabel, a member of Syracuse's University Senate.  *HillTV content.*  By closing HillTV in its

entirety, with Abbott's full participation, Syracuse opted for collective punishment. This meant implementing procedural shortcuts that Syracuse would later apply to John Doe. The university meted out this collective sanction without formally notifying the students involved of what charges or code violations Syracuse (and Abbott) presumed them to be responsible for. *Syracuse University head shuts down student TV station.*

78. Carrie Grogan Abbott was the chair of John Doe's Hearing Board, which found him responsible for sexual assault in May 2017. She continued to apply the biases that she had already shown in the HillTV controversy, which involved curtailing procedural rights in favor of censorship and a crackdown on "rape culture" at Syracuse.

*2) Defendant Sheila Johnson-Willis*

79. Syracuse's Chief Equal Opportunity and Title IX Officer is Defendant Sheila Johnson-Willis. She heads Syracuse' Title IX office and has exhibited bias against male alleged perpetrators throughout her term. She served as interim head of that office in 2016/2017 when Syracuse expelled John Doe. In February 2018, Syracuse named her Associate Vice President of its Title IX office, making her position permanent.

80. At all times relevant to this Complaint, Chief Title IX Officer Johnson-Willis led Syracuse's response to external pressures to increase enforcement of Title IX, show increased prosecution of alleged male perpetrators, and eradicate the supposed "rape culture." (See *Sheila Johnson-Willis Appointed Chief Equal Opportunity and Title IX Officer*, Syracuse University News (February 15, 2018) (available at https://news.syr.edu/blog/2018/02/15/sheila-johnson-willis-appointed-chief-equal-opportunity-and-title-ix-officer/).

81. Chief Title IX Officer Johnson-Willis' bias has been caught on live video. On or around November 2015, a young woman from the conservative organization Project Veritas filmed a meeting in her office. The young woman posed as a traumatized student. She claimed

to be "triggered" and oppressed by the Constitution of the United States (including Amendments such as the Fifth and Fourteenth that guarantee due process).  (*See*

https://www.youtube.com/watch?v=4THEcWCpEgQ at 5:40).

82.    The student said she was "completely shocked" by "such an oppressive document."  *Id.*  She argued to Chief Title IX Officer Johnson-Willis that the Constitution discriminates against women and minorities.  *Id*. at 6:06.  In response, Chief Title IX Officer Johnson-Willis not only nodded in assent, but she also took out scissors and cut up the Constitution in front of the student's eyes to assuage the student's hurt feelings.  *Id.*

83.    This was clearly a set up by Project Veritas, but however fake the student's alleged "trauma," the reaction of Chief Title IX Officer Johnson-Willis was real.  Johnson-Willis' reaction demonstrates that she and her office support and collaborate with female students who allege even the most implausible "victimization," whether or not this comes at the expense of male students.

*3)  Defendant Bernerd Jacobson*

84.    Syracuse's Title IX office and its administrators exert themselves to protect perceived female victims.  Defendant Investigator Jacobson, who handled John Doe's case is a prime example.  Syracuse's Equal Opportunity, Inclusion, & Resolution Services hired him in 2015, exactly the time pressure began to boil over to increase sexual assault prosecutions, increase the sanction of men, and protect female victims from male "rape culture."

85.    Ostensibly, a Title IX investigator must be "prompt, thorough, and impartial."  See OCR, Revised Sexual Harassment Guidance: Harassment of Students by School Employees, Other Students, or Third Parties (January 2001) at 15.  But Syracuse hired Investigator Jacobson due to his background in victim advocacy, in which he championed the victim's voice.  He is not

unbiased.  On information and belief, he performs his job as the protector and advocate of victims, almost exclusively female.  He is not neutral; he is their advocate.

86.     As addressed more fully below, Investigator Jacobson utilizes biased "trauma-informed" interview techniques, which privilege the account of alleged victims over accused male students.

87.     Investigator Jacobson is a devotee of Trauma Informed Victim Interview Techniques, also known as Forensic Experiential Trauma Interview techniques.  He has "liked" articles promoting such techniques on the social media site LinkedIn.  On information and belief, Syracuse selected Investigator Jacobson not only because of his background as a victim advocate but also because of his enthusiasm for these so-called "trauma informed" techniques.

88.     In brief, "trauma-informed" techniques hold that victims' memories are fragmented and prone to expressions of feelings or sensations rather than the precise recall of events.  According to this methodology, trauma affects the prefrontal cortex of the brain, causing victims to lose their ability to think logically or direct their attention to details.  Primitive brain structures allegedly take control of victims and shape their memory as witnesses.  By contrast, the perpetrator of a sexual assault (often stereotyped as a repeat offender—which John Doe obviously was not) are supposedly rational actors, planning, practicing, and even becoming habitual rapists and sexual predators.

89.     Trauma-informed techniques turn unreliable evidence into its opposite and vice versa.  Inconsistency in the alleged female victim's account thereby becomes evidence that her testimony is truthful, because of alleged trauma.  Conversely, the accused's consistent story becomes evidence that he is a premeditated and experienced sex offender.

24

90.     Syracuse has taught the "trauma-informed" technique to its Title IX investigators and administrators.  See University Faculty, Staff Receive Training on Investigating Complaints of Sexual Violence, Title IX Compliance, February 6, 2017 (available at https://news.syr.edu/2017/02/university-faculty-staff-receive-training-on-investigating-complaints-of-sexual-violence-title-ix-compliance/).  On information and belief, Investigator Jacobson and others were influenced by and adopted these techniques prior to January 2017 and applied them to John Doe and RP at every stage in the investigation.

91.     On information and belief, Syracuse provides training in an amateur and unprofessional manner to individuals with no proper education, degree, or specialized background in counseling and therapy, which is further indication of Defendants' willingness and desire to bias investigation and hearing processes from their inception.

92.     As implemented at Syracuse and applied to RP and John Doe, "trauma-informed" techniques are not gender neutral.  Trauma informed techniques have been openly and clearly identified by the OCR and New York State law as techniques specifically utilized to protect "girls and women."  *See* https://www.nasmhpd.org/sites/default/files/FedPartnersOCR.pdf.  In 2014, the OCR mandated that all persons involved in implementing a school's grievance procedures should have training or experience in the effects of trauma.  *See e.g.*, OCR, April 29, 2014 Questions and Answers on Title IX and Sexual Violence at Answer E-2, I-1, J-1 (available at https://www2.ed.gov/about/offices/list/ocr/docs/qa-201404-title-ix.pdf).

93.     Syracuse has implemented the trauma-informed approach despite the lack of solid scientific support for this method in assessing the testimony of victims.  *See e.g.,* Emily Yoffe, *The Bad Science Behind Campus Response to Sexual Assault,* The Atlantic, September 8, 2017

(available at https://www.theatlantic.com/education/archive/2017/09/the-bad-science-behind-campus-response-to-sexual-assault/539211/).

94.     Syracuse also freely applies this technique in the absence of credible, clinical diagnosis of trauma and without first determining if there is a history of other trauma that may be influencing the alleged victim's report of a given incident—trauma independent of and without any connection to the accused student.

95.     Neither Investigator Jacobson, nor any other Title IX administrator or hearing officer on Syracuse's campus, is trained to recognize or diagnose trauma, trauma history, or other potential mental health issues that may be present at the report of an incident.  Not one member of the Appeals Board that heard John Doe's case had the training necessary to verify symptoms of actual trauma.  Syracuse applies "trauma-informed" techniques to any alleged female victims, whether or not they have experienced verifiable trauma.

96.     This was the case with RP.  These techniques were freely applied to RP despite the absence of any clinical determination of whether, in fact, RP suffered trauma.  RP never went to the hospital to seek treatment for trauma and, in one interview with the SPD, she admitted the opposite: saying she "was not fearful or upset" by John Doe.  Additionally, not one investigator, counselor or professional was asked if there was evidence of past trauma, mental health issues or pressure from Syracuse personnel that would cause RP to make an incident report.  By utilizing the "trauma informed" technique, the investigation was tainted.

97.     Syracuse applies "trauma-informed" techniques with bias against accused male students.  There was, for example, significant, undisputed evidence that John Doe experience trauma due to his and RP's transgression of their Christian morals, due to his betrayal of his girlfriend, and due to sincere feelings of disappointment and disbelief that he and RP had

26

consensually participated in premarital sex.  John Doe sought professional assistance and support throughout the fall of 2016 in order to deal with his actions during this time.  But Investigator Jacobson and Syracuse's other administrators had no interest in the effect of the events on his well-being.  The investigator and hearing officers failed to apply "trauma-informed" techniques to John Doe as the alleged male perpetrator, when, in fact, he could well have been the traumatized person.

98.     Furthermore, RP's allegations that she had been shocked or experienced trauma are among the most inconsistent statements she made about her sexual encounters with John Doe.  In her various accounts, she alleged being "shocked" and experiencing "trauma" only late in the process.  This "shock" and alleged "trauma" surfaced only after her statements had been shaped by Investigator Jacobson and other Syracuse Title IX administrators.  On information and belief, RP never sought medical attention or the care of a treating professional for alleged trauma, and she was never diagnosed with any trauma.  This information and belief is based on the fact that neither she nor Syracuse provided any evidence of such during the Hearing or on appeal.  None was ever brought forward.  As with all else in the case, Syracuse uncritically (and selectively) credited RP's inconsistent statements.

99.     Syracuse takes it as an article of faith that women who allege sexual assault have been, de facto, traumatized.  Inconsistencies in victim accounts then serve to confirm what the "trauma-informed" method assumes—namely, trauma and therefore, guilt imposed upon the alleged perpetrator.  By the time Syracuse's Hearing Board made its decision on May 5, 2017, it had concluded, in the absence of any credible evidence, testimony, or expert witnesses that, "this incident has caused the Complainant [RP] significant trauma…"

**D.  RP Reports Contradictory Accounts of a Sexual Assault Encounter with John Doe**

100.     RP's allegations of sexual assault went through several permutations.

*1)  RP's Account of the Encounter on November 15, 2016*

101.   On or around November 15, 2016, RP discussed her sexual encounters with a Syracuse professor whom Syracuse has declined to identify.  On information and belief, the Syracuse professor, reacting to pressure and social movements within Syracuse to increase the prosecution of men and reform so-called "rape culture," encouraged RP to rethink the consensual events of November 13, 2016 as non-consensual.  RP was encouraged to understand her moral discomfort, which grew out of her Christian morals and her conflict over her virginity, through the lens of a passive female victim and see John Doe as a male sexual aggressor.

102.   Syracuse's investigation did not investigate what the professor said or how RP's account to the professor differed from her other accounts of the events.  John Doe was not provided the opportunity to find out what the professor said, let alone cross examine.  John Doe could not determine whether or not RP's statements to the professor were consistent with her (contradictory) reports to others.

103.   Additional evidence that would assist in the investigation was also destroyed by RP.  At this time, she deleted all of her text messages between John Doe and herself, eliminating evidence of their consensual contact and communications.

104.   RP reported a "sexual assault" to the Syracuse Department of Public Safety ("DPS"), Officer Matthew Zingaro at approximately 3:12 PM on November 15, 2016.  Officer Zingaro referred the matter to the Syracuse Police Department.

105.   Approximately four hours later at 7:00 p.m., Syracuse Police Officer Marlena Jackson of the Criminal Investigation Division interviewed RP in Syracuse's Sims Hall.  RP told Officer Jackson that she "did not wish to have any physical contact with [John Doe] on the reported date/time and did not consent ***to having any sexual relations*** with" John Doe on

November 13, 2016 (emph. added).  She did admit, however, that "past incidents were consensual."

106.    Thus, RP first insisted that there was no consensual sexual contact of any kind during their third sexual encounter, about which she later flip-flopped and retracted with regard to certain sexual behavior.  She later changed elements of her story as she spoke with SPD detectives, Investigator Jacobson, and others.

107.    Importantly, Officer Jackson made no record that RP reported trauma, nor did the Officer note any observations of RP's alleged trauma.  RP did not seek medical attention, nor did the Officer report having recommended she seek medical attention.  RP did not report any physical, emotional or other means of force or influence used by John Doe that could have kept her at his residence.  She did not report intimidation of any kind.  At no time did she suggest that she had not been at liberty to leave the apartment.

*2)  RP's Account of December 6, 2016*

108.    Three weeks later (December 6, 2016), RP gave a second, more extensive account to Officer Michael Murphy of the SPD's Abused Persons Unit.  Officer Murphy interviewed her at the McMahon/Ryan Child Advocacy Center in Syracuse.  This time, RP addressed her struggle with her religious beliefs and betraying her boyfriend by having "hookups" with John Doe.  She also knew that John Doe was in a relationship with another woman and felt guilty about that too.  She knew the other woman because they went to the same private high school together in Connecticut.  RP discussed her Christian faith with candor, explaining her desire to follow Christian teachings, which "included abstaining from sexual intercourse until marriage."

109.    She told Officer Murphy that a "hand job" and "fingering" was "as far as things had ever gone with [John Doe] during any of their consensual encounters."  Thus she denied

29

having had mutual oral sex or attempting vaginal intercourse before November 13, 2016.  This highlights another part of her story that would change in later reports.

110.    In recounting the events of November 13, 2016, RP changed her initial account and report to Officer Jackson on November 15, 2016 and even changed her account in the course of relating events to Officer Murphy.  Previously she had insisted that ***nothing*** was consensual during the third sexual encounter.  She now "acknowledged kissing [John Doe] back."  Likewise, although she first insisted to Officer Murphy that "fingering" and a "hand job" was "as far as things had ever gone during any of their consensual encounters."  She then admitted to a pregnancy scare over their second encounter (of October 24) because they had attempted vaginal intercourse, but "her inexperience made penetration difficult."  She also flip-flopped and insisted that the previous attempt at vaginal intercourse had been ***non-consensual***.

111.    She had first told Officer Jackson on November 15, 2016 as well as Officer Murphy that "these previous instances had been consensual," i.e. October 11 and 24, 2016.  Having admitted to previously consensually attempting vaginal intercourse in October, she singled out this one element of their encounter to Officer Murphy (on December 16, 2016) and said it was non-consensual.

112.    With regard to their third sexual encounter, RP described no force, threats, or coercion by alcohol or any other undue influence, bribery or physical or emotional manipulations by John Doe.  She avoided mention of mutual oral sex.  She also described her participation in their sex as passive:  She "ended up with her clothes off" and "ended up on top of [John Doe] … [and] remained on top of him for a few minutes."

113.    It is of great importance and consistent with her report to Officer Jackson, that RP did not describe any trauma to herself in her report to Officer Murphy.  She said merely that she

"wasn't ok with how the incident unfolded." Had John Doe been afforded rights to cross examine RP in a meaningful way, he could have exposed these and other statements as vague and ambiguous and lacking in any credibility; but Syracuse denied him this right.

114.    By contrast to her own emotional stability, RP described John Doe as an "emotional mess" after their first "hook up." John Doe became "emotional" because he was unfaithful to his girlfriend and also because of their shared Christian morals and commitment to not have premarital sex. When he eventually broke up with the other woman, RP related, John Doe called her and cried on the telephone. John Doe expressed his upset after their second "hook up" (October 24, 2016). He clearly identified and expressed his angst and difficulties with their actions. Yet, in stark contrast, in her reports, she recounted no trauma and no emotional upset as a result of any of the incidents.

115.    RP concluded her second interview by stating that she did not want to see John Doe prosecuted or punished or further investigated.

116.    On December 9, 2016, the SPD completed a detailed interview with John Doe as part of its investigation into the events of November 13, 2016.

117.    Having completed their investigation and thoroughly reviewed the reports and acting under their legal and ethical duties and responsibilities, the SPD closed any and all criminal investigation.

   *3) Investigator Jacobson of Syracuse's Title IX Office Interviews RP*

118.    After the Syracuse Police Department closed its case, but still amidst campus pressure and tension over the school's supposed "rape culture," Syracuse initiated its Title IX complaint against John Doe on January 25, 2017, a full two months after the incident and initial report, albeit the day after OCR attorneys came to campus to meet with students, faculty, and administrators on campus.

31

119.     Investigator Jacobson interviewed RP the same day.  He again interviewed RP on April 3, 2017, a full three months after the first interview and a full *six* months after her initial report.  With investigator Jacobson, RP reverted to her account that the two sexual "hookups" in October had been entirely consensual and *dropped* her allegation of any sexual assault before November 13, 2016, this was another inconsistency in her reports from interview to interview.  Yet, Investigator Jacobson did not further investigate or question her about this inconsistency.

120.     As to their third encounter, RP reverted to insisting that ***nothing was consensual*** and that "she didn't do anything that he could have interpreted as 'yes.'"  She gave no specific answers about actions that clearly required at least some of her input or some affirmative act on her part.  She added, for example, she was "not sure how she got on his lap" when they moved to his couch.  For the first time, RP averred that she "was in shock."  Investigator Jacobson did not inquire as to why she had not alleged being in "shock" before.  RP did tell him, however, that she had not gone to the hospital.  She provided no evidence that she had been diagnosed or treated for "trauma" of any kind.

121.     Later in their interview, RP discussed oral sex, and related that this had been consensual on November 13, 2016.  RP "said that, 'he wanted me to do oral on him' he asked 'can you help me?'  And she did."  Patterns of behavior can constitute cues of consent in sexual activity, and the November 13, 2016 encounter was more or less a carbon copy of the first two.  But Investigator Jacobson did not inquire as to what made RP claim that she had become passive and bereft of "choice," or what distinguished their previous consensual oral sex from this sex act, which she apparently felt to be nonconsensual.

**E.  Syracuse's Biased Investigation and Title IX Process**

122.     Syracuse has promulgated policies to address sexual misconduct as well as other student conduct code violations.  These include, among others, Syracuse's Statement of Student

32

Rights and Responsibilities (https://policies.syr.edu/policies/academic-rules-student-responsibilities-and-services/statement-of-student-rights-and-responsibilities/); the Syracuse Code of Student Conduct (https://policies.syr.edu/policies/academic-rules-student-responsibilities-and-services/code-of-student-conduct/); Syracuse policy captioned Sexual Harassment, Abuse, and Assault Prevention ("Title IX Policy") (https://policies.syr.edu/policies/university-governance-ethics-integrity-and-legal-compliance/sexual-harassment-abuse-and-assault-prevention/); the Student Conduct System Handbook ("Conduct System Handbook") (http://studentconduct.syr.edu/_documents/StudentConductSystemHandbook2017-2018.pdf); and the policy entitled Sexual Activity, Non-Consensual (https://policies.syr.edu/policies/university-governance-ethics-integrity-and-legal-compliance/sexual-activity-non-consensual/).

123.    Syracuse's policies, including but not limited to those listed above, form binding contractual obligations between Syracuse and its students upon Syracuse's acceptance of the students' payment of tuition under New York law.  Syracuse is contractually bound to follow its own policies.

124.    Syracuse's Statement of Student Rights and Responsibilities (https://policies.syr.edu/policies/academic-rules-student-responsibilities-and-services/statement-of-student-rights-and-responsibilities/) guarantees "fundamental fairness":

> Students have the right to fundamental fairness before formal disciplinary sanctions are imposed by the University for violations of the Code of Student Conduct-as provided in the published procedures of the University's Student Conduct System or other official University publications. Students have the right to written notice and the opportunity for a hearing before any change in status is incurred for disciplinary reasons unless a significant threat to persons or property exists.

*Id.*, ¶ 9.

125.    The Conduct System Handbook also provides a statement of student rights and responsibilities with slightly different wording at Paragraph 9, captioned FUNDAMENTAL FAIRNESS (emph. in orig.):

> Students have the right to written notice and the opportunity for a hearing before any change in status is incurred for disciplinary reasons unless a significant threat to persons or property exists. Students have the right to fundamental fairness before formal disciplinary sanctions are imposed by the University for violations of the Code of Student Conduct--as provided in the published procedures of the University's Student Conduct System or other official University publications.

*Id.*

126.    Syracuse promulgated its Title IX Policy and its Conduct System Handbook to comply with the requirements of Title IX and other applicable laws, such as the Clery Act, 20 U.S.C. § 1092(f), and implementing regulations. Title IX Policy, § III.

127.    Syracuse's Title IX Policy provides "distinct procedures" for the investigation and resolution of student complaints of sexual misconduct. *Id.*, § V.A. And under the Clery Act, Syracuse is required to report its Title IX Policy and the procedures set forth in the Conduct System Handbook to the federal government. This must include procedures to insure rights of the accused. *See e.g.*, 34 C.F.R. 668.46(k)(2).

128.    In contravention of federal regulations that require Syracuse to provide fair and unbiased proceedings, Syracuse' policies are overwhelmingly oriented toward encouraging alleged victims to report sexual assault and to "believe" their accounts at the expense of due process and the rights of the accused.

129.    By way of example, Syracuse's policy, Sexual Activity, Non-Consensual does not address the rights of accused students at all. It states only, "Members of the University community found to be in violation of this policy through the procedures and systems described above shall be subject to sanctions, including suspension and permanent expulsion." *Id.* It does

34

not promise any protections or equitable treatment for the falsely accused or provide procedures to protect the falsely accused.  It only encourages alleged victims to bring forward their complaints and promises them various protections, support, and services.  *Id*.

130.    Syracuse applies a preponderance of the evidence standard to cases of sexual misconduct and does not apply formal rules of evidence.  The Title IX Policy defines "preponderance" as "evidence which is of greater weight or is more convincing than opposing evidence such that it is 'more likely than not' that an act occurred."  Title IX Policy, § G.1.g.  In practice, however, Syracuse imposes a presumption of responsibility on the accused male student, who must bear the burden of proving innocence rather than prevailing by a preponderance of evidence.

131.    The Title IX Policy provides that investigations will take no longer than 60 business days from the time a complaint is received, and that the decisional or adjudicatory stage will take no longer than 15 calendar days from the start of the adjudicative or hearing process to the time a decision is rendered.  Id., § G.1.j. But the Conduct System Handbook, Part 10.21 Provides that the entire process will be concluded within 60 days of the original complaint, "pending special circumstances." There were no special circumstances in John Doe's case, and yet Syracuse failed to comply with these timelines.

132.    Syracuse's statements of "fundamental fairness" as well as specific promises set forth in the Conduct System Handbook provide for Notice.  In addition, Conduct System Handbook, Part 10.15 provides that "The complainant and respondent will be notified simultaneously in writing of the charges filed against the respondent."  Syracuse failed to provide such notice to John Doe, who was never notified, and still to this day has not received the complaint against him.

133.    Furthermore, 34 C.F.R. 688.46(k)(i)(B)(2-3) requires Syracuse to report procedures for timely notice in advance of any meeting or hearing, including investigatory interviews, and to provide all evidence and information that will be used during informal and formal disciplinary meetings and hearings.  Syracuse again failed to provide such notice or evidence to John Doe in advance of meetings at which he was interviewed by Syracuse's Title IX investigators.  John Doe was not provided with information used by investigators against him in advance of these meetings.  This deprived John Doe of the ability to know the evidence Syracuse had collected against him.

134.    John Doe has still not received a copy of the Complaint despite requesting his student educational records twice from Syracuse under FERPA on May 12, 2017 and again in March 2018.  The complete disciplinary file provided to John Doe by Syracuse in response to his FERPA requests contains no complaint.  The only way that John Doe learned of the complaint was through a single reference in the final investigation report, which merely lists the date Syracuse originated the complaint: January 25, 2016—the day after OCR attorneys came to Syracuse to encourage stepped up prosecution of alleged perpetrators.

135.    Syracuse's policy for issuing a No Contact Orders ("NCO") is contained in its Student Conduct System Handbook (the "Handbook," available at http://studentconduct.syr.edu/_documents/StudentConductSystemHandbook2017-2018.pdf). The Handbook addresses NCOs in Part 4.

136.    Part 4.5 allows for NCOs to be issued to the Department of Public Safety, the Office of Residence Life, or the Title IX Coordinator.  *Id*.  NCOs may be issued when "there is reason to believe that continued contact is not in the best interest of the involved students to promote their safety and security."  *Id*.  Part 4.7 states that "[i]f a No Contact Order is issued,

36

both parties will receive a written copy of the Order and both parties are expected not to have contact with one another." *Id.*

### F.  Syracuse Refuses to Follow its Own Rules and Policies

*1)  The Secret No Contact Order*

137.    Syracuse breached its policies and Defendants highlighted their bias against John Doe as demonstrated by the fact John Doe became aware of the Title IX Complaint against him only inadvertently and with no notice from Syracuse.  The first inkling of any administrative action against him surfaced in the context of a secret NCO.  Back in November 2016, when the Syracuse DPS first received a report, DPS issued a No Contact Order (dated November 15, 2016, the "November NCO").

138.    Syracuse issued the November NCO only against John Doe, and then violated its procedure by failing to notify John Doe of its existence.  In fact, Syracuse kept the November NCO secret without informing John Doe or advising him of its existence in any manner.  Nor did Syracuse inform RP that it would keep the November NCO secret, opening the door to her accusations that he was further violating Syracuse's rules by contacting her.

139.    Syracuse also violated its policies by failing to issue a symmetrical NCO instructing RP to stay away from John Doe.  This again highlights Syracuse's bias, providing further evidence of Syracuse' position that only women must be protected from men.  John Doe had to bear the entire burden of staying away from the woman who had accused him, but she had no obligation to stay away from him.  And Syracuse placed this burden, expectation and restraint on him without knowledge or notice.

140.    John Doe learned about the existence of the November NCO over two weeks after it was issued and at that time only by coincidence, not by actual notice.

141.    The November NCO came to light only because RP complained to the Syracuse DPS on December 2, 2016 that John Doe had contacted her by voicemail the previous week (on November 27, 2016)—*a full week* after the actual contact.  RP admitted when she did finally notify DPS of the voicemail that John Doe had not been inappropriate in any way.  Furthermore, RP stated to the DPS that she was not fearful or upset due to John Doe.  Again there was not the slightest evidence of trauma or shock.

142.    At the time John Doe left RP a voicemail, he thought the issue was behind them. There had been no further incidents between John Doe and RP since their third sexual encounter. As John Doe knew, they had voluntarily resolved to stay away from each other physically in order to contain their mutual physical urges and abide by their Christian values.

143.    But because Syracuse issued the November NCO and kept it secret, RP believed John Doe was violating Syracuse rules and had disobeyed the NCO.  By keeping the NCO secret, Syracuse caused John Doe inadvertently to aggravate RP, who blamed him for breaking the rules, even though he could have had no idea he was breaking the rules.  Syracuse had actually created the offense.

144.    Syracuse's Office of Student Rights and Responsibilities informed John Doe of the November NCO's existence in an email of December 1, 2016.  The office announced that it had "reviewed the Temporary Order of No Contact [i.e., the November NCO] … and … determined that it will remain in effect at this time"—although John Doe could not be aware of the NCO in the first place.

145.    The Office of Student Rights and Responsibilities did not make reference to any outstanding Title IX Complaint.  There was no complaint against John Doe at this time.  There was no need.  RP admitted that she "was not fearful or upset" by John Doe and had not initiated

a complaint.  The SPD had closed its investigation.  There had been no sexual assault because John Doe and RP's sex had been consensual.

> 2)  *Syracuse Initiates the Title IX Complaint Against John Doe in Response to OCR Pressure to Increase the Prosecution of Male Students*

146.    On information and belief, and without any other apparent reason, Syracuse decided to proceed with a complaint against John Doe in response to the presence of OCR attorneys on campus and ongoing student, media, and government pressure to confront a supposed "rape culture" at Syracuse.  Syracuse initiated its complaint on January 25, 2017, one day after OCR's attorneys arrived on campus on January 24, 2017 but over two months after the report of the incident by RP.  This was also over a month after the Syracuse Police Department had closed its investigation.

147.    Again, Syracuse initiated its complaint and investigation only two and a half months after the alleged incidents of November 13, 2016 were reported to Syracuse.  With attorneys from OCR still on campus and holding meetings, Syracuse decided to make John Doe an example of Title IX enforcement.

148.    Syracuse initiated the investigation under Investigator Jacobson of Equal Opportunity, Inclusion, & Resolution Services.  Investigator Jacobsen interviewed RP the same day (January 25, 2017) on which he dated Syracuse's "complaint."

149.    Despite Syracuse's belated rush to action, Investigator Jacobson did not complete the Investigation Report ("Jacobson Report") until over two and a half months later, April 17, 2017.

150.    The Jacobson Report summarizes two interviews with RP of January 25, 2017 and April 3, 2017 as well as the statement that John Doe made to Detective James Hill of the

Syracuse DPS on March 15, 2017.  In addition, Investigator Jacobson appended the SPD's police reports of interviews with RP and John Doe.

151.    Investigator Jacobson failed to scrutinize contradictions between RP's various statements or consider RP's destruction of text messages and other evidence in weighing her credibility.  In particular, there was no credible evidence of trauma, particularly no clinical evidence.  The most that RP stated is that she "most likely" felt shock.

152.    According to Syracuse's Title IX policies, Investigators are not supposed to make ultimate decisions or recommend decisions on responsibility or non-responsibility.  Their role, as set forth in Part 10.13 of the Conduct System Handbook, is to describe relevant facts and circumstances and to provide statements of the interviews conducted during the investigation. The investigator's report "will not include any conclusions regarding responsibility for violations of the Code of Student Conduct."  *Id*.

153.    Investigator Jacobson made the following factual findings:

- Both RP and John Doe corroborated each other's account of their interactions over the course of the fall semester, including their first two consensual sexual encounters.

- There were no third-party witnesses to the events of their third encounter of November 13, 2016.

- Both RP and John Doe gave "highly corroborative accounts" of the third sexual encounter of November 13, 2016.

- There were no "third party witnesses or objective evidence … to bolster one account over the other."

The case therefore came down to RP's say-so versus John Doe's account of events.

154.    Any assessment on credibility was therefore an ultimate decision on the case.  It created a preference for one party's account over the other.  It became, de facto, a dispositive prejudgment of John Doe's case.  Investigator Jacobson should not have been permitted to make

such an assessment, given that his role was merely to report facts, not to decide the case.  And he certainly should not have made such an assessment without any substantial evidence.

155.    Investigator Jacobson nevertheless provided an affirmative credibility assessment in section V of the Jacobson Report, which clearly advocated for the female victim.

156.    He discussed RP's "credibility" over three paragraphs and inexplicably concluded, "Complainant [RP] is assessed as credible and the information she provides is reliable."  Yet again, he failed to address and consider the fact that she rendered multiple versions of events and interactions with John Doe.

157.    Investigator Jacobson disregarded and gave no account of inconsistencies in RP's statements, in particular RP's vacillation about sexual contact on November 13, 2016 to which she had consented after claiming that *no* sexual contact had been consensual on that day.  He also gave no account of RP's vacillation about attempted vaginal sex prior to November 13, 2016, in which she had accused John Doe of another sexual assault to SPD officer Murphy, contradicting clear statements that the prior two sexual encounters had been consensual.

158.    Investigator Jacobson then gave only cursory treatment to John Doe's consistent accounts in three sentences:

> Respondent provided a description of events, which was also entirely plausible. His demeanor during the interview was appropriate. The respondent spoke freely and was not hesitant when providing details regarding the complaint. The respondent became upset as to why this complaint was filed.

159.    Having emphasized RP's "credibility" as a female victim, Investigator Jacobson assessed the male accused student as only "plausible."  He gave no reason to withhold an assessment of "credible" from John Doe—whose accounts were consistent.  Investigator Jacobson prejudged John Doe by withholding the all-important assessment that John Doe was "credible."

41

160.    Furthermore, Investigator Jacobson had no grounds to pass judgment on John Doe's credibility because he did not interview John Doe or observe his demeanor.  John Doe had been interviewed by a detective and provided a written statement.

161.    Given that the case came down solely to the credibility of the parties, without external objective evidence or witnesses, Investigator Jacobson saddled John Doe with a finding of responsibility completely untethered from objective reasons, external evidence, or observation.  Investigator Jacobson's finding of credibility and, therefore, Syracuse's finding of credibility was made without application of the preponderance standard, as required by Syracuse policies.  *See e.g.,* Conduct System Handbook, Part 10.17, Title IX Policy, § G.1.g.

162.    Investigator Jacobson's unusual and protracted delay of his investigation also breached Syracuse's Title IX Policy and Conduct System Handbook.  Syracuse's contractual agreement through its Conduct System Handbook promises students that Syracuse's Title IX office will complete investigations and render conduct code decisions (including a hearing) within 60 days.  *See* Conduct System Handbook, Part 10.21.  If the process is delayed, both parties must be sent written notification of the delay and its cause.  *Id*.

163.    Syracuse initiated its investigation and its complaint only on January 25, 2017, the day after OCR attorneys came to campus.  Up to that time, Syracuse had taken no action since November 15, 2016, the date the matter was reported to them.  Even after the belated January 25, 2016 complaint, however, Syracuse's Title IX office did not interview John Doe until March 15, 2017.  This was a full 49 days after an already delayed response to RP's incident report.  Investigator Jacobson then delayed producing his report for more than a month, releasing it April 17, 2017.  This was 82 days from the date of the Syracuse Complaint and a full six months from the time the matter was first reported to Syracuse.

164.    Maximizing the prejudice to John Doe, the Jacobson Report was also timed within the closing weeks of the spring semester, when John Doe was only one course short of graduation with his Masters degree.  Yet, John Doe never received any written explanation or notice for Syracuse's delay, contrary to and in violation of Syracuse's Conduct System Handbook, Part 10.21.

165.    John Doe's hearing was not scheduled until May 5, 2017, the first day of his finals week.  This marked a full 101 days, and Syracuse did not notify John Doe of its decision to expel him until six days after that.  In fact, John Doe spent additional tuition for Spring Semester, valuable time and effort to complete his Masters Program—all for naught.  Syracuse's unreasonable delay, violation of Title IX, violation of its own Policies and Procedures as embodied, without limitation, in the Conduct System Handbook prejudiced John Doe financially, emotionally, educationally, and vocationally.

### G.  The University Conduct Board Hearing

166.    John Doe received the first and only notice from Syracuse on April 28, 2017 ("Notice").  The Notice formally informed John Doe of the formal charges brought by Syracuse:

> 1) Physical harm or threat of physical harm to any person or persons, including but not limited to: assault, sexual abuse, or other forms of physical abuse.
>
> 3) Conduct— whether physical, verbal or electronic, oral, written or video— which threatens the mental health, physical health, or safety of any person or persons including, but not limited to hazing, drug or alcohol abuse, bullying or other forms of destructive behavior.
>
> 15) Violation of University policies, rules or regulations that are published in the Student Handbook, or other official University publications or agreements.
>
>   • Syracuse University Policy on Sexual Assault, Sexual Harassment, Stalking or Relationship Violence

167.    The Notice represented that the "primary purpose of the University Conduct System is to educate and protect all members of the University community.  Sanctions, if

imposed, are designed to accomplish these goals." They are not and should not "be primarily punitive in nature."

168.    The Hearing took place on May 5, 2017 before a panel of three career administrators: Chair, Carrie Grogan Abbott (who had taken part in the censorship and closure of HillTV without due process), Director of Syracuse's Office of First-Year and Transfer Programs; Bill Longcore, Associate Director of Syracuse's Central Office and Administrative Staff; and Casey Morris, Senior Supervisor of Syracuse's Facilities and Technical Services (the "Board").

169.    The findings of the Board were internally contradictory: The Board followed Investigator Jacobson's findings and found RP credible; but at the same time, the Board expressly found that RP made multiple untrue statements about her sex with John Doe.

170.    The Board expressly indicated that RP had misrepresented consensual sexual activity as nonconsensual. RP's accounts had vacillated between insisting that portions of her sexual encounter on November 13, 2016 with John Doe were consensual and insisting that *nothing* about their sexual activity that day was consensual.

171.    The Board specifically found that RP was *not* credible in stating that she had consented to *no sexual activity* on November 13, 2016. The Board found that John Doe carried Complainant to his bedroom (Fact #6), which RP had insisted was against her will, but the Board did not find this credible. The Board instead found that RP and John Doe continued consensual kissing (Fact #7).

172.    The Board found that RP "withdrew consent" once the couple entered the bedroom, although the Board found that John Doe respected RP and had "stopped the interaction." (Fact #8.) After that point, the Board considered consent permanently and irrevocably withdrawn—without, however, making any findings as to how John Doe somehow

forced RP to position herself on top of him or forced, physically, emotionally, or otherwise, her mouth onto his penis, activities ordinarily requiring the active participation of the individual performing the acts.

173.   The Board determined that John Doe lacked credibility simply because he admitted to 1) having sexual desire for RP, and 2) admitted to being "horny" during their interactions.

174.   Applying archaic stereotypes of male sexual desire, the Board took John Doe's admission of being "horny" as evidence that he could not credibly deny sexually assaulting RP. The Board found "that [John Doe] premeditated these actions and had intent to engage in sexual contact and intercourse with the Complainant from the moment he saw her at church"—because "[b]y [John Doe's] own admission, when he saw her at church, he knew he wanted to have sexual relations with her and knew that such acts would occur."  By this biased standard, any confession by a male student of sexual desire counts as evidence of pre-meditated sexual assault.

175.   It nevertheless conformed to the stereotype and archaic assumption that Syracuse was beset by a male "rape culture" driven by uncontrollable male sexual desire, while female students are its passive victims and targets.  At no point did the Board question RP about her desire for John Doe.

176.   The Board discounted all statements by John Doe that he had repeatedly asked and received express consent from RP and had received it.

177.   The Board also held it against John Doe that their sexual encounter had started, stopped, and began again.  Undisputed evidence that John Doe had done the right thing by ceasing sexual contact where RP said, "no," was thus another piece of evidence Syracuse turned

on its head.  The Board held this to be evidence that no further affirmative consent was possible.  John Doe was simply damned if he did and damned if he didn't.

178.    The Board also credited RP's account that she was "fearful of leaving" John Doe's apartment "prior to sexual contact," which she alleged for the first time at the hearing.  The Board thus disregarded RP's previous statement that she was not fearful or upset by John Doe.  The Board concluded that the incident "caused [RP] significant trauma and is affecting her mental well-being"—in the absence of any diagnosis, clinical evidence, or expert testimony and contrary to RP's own statements.  By contrast, the Board ignored undisputed evidence of John Doe's mental anguish and trauma, which had caused him to call a counseling hotline twice.

179.    "Trauma" averred by the alleged female victim was enough to justify contradictions in her story.  Undisputed trauma of the male student, however, did not make his consistent story credible to the Board.

180.    The Board gave no explanation for its contradictory findings.  It simply made the blanket statement that RP was credible after expressly finding her to be untruthful in denying consent to other sexual acts and in finding her to be untruthful about allegations of non-consensual attempted vaginal intercourse on October 24, 2016.

181.    On information and belief, RP gave additional contradictory testimony to the Board.  Syracuse did not permit John Doe to hear what RP said about him and thus denied any meaningful opportunity for cross-examination.  After the fact, John Doe was told he had to order a transcript and pay for it, but even if he had done so this was no substitute for learning the evidence against him at hearing or a chance to cross-examine RP.  Syracuse continues to withhold any record of RP' is testimony to the Board, despite multiple FERPA requests from John Doe.  The only conclusion is that Syracuse kept no record, and Syracuse made none.

182.    Although the Conduct System Handbook, Part 10.16 provides for written and audio recorded transcripts of interviews conducted by the Board, the Board did not make such recording.  The absence of a recording also precluded any record to be reviewed on appeal as provided by Syracuse's Title IX Policy and Conduct System Handbook.  Conduct System Handbook, Part 12.

183.    On or around May 11, 2017, John Doe timely submitted a notice that he intended to appeal the Board's decision.  *See id.*, Part 12.2.  Syracuse provides for appeal on the following grounds:

> a. New information not reasonably available at the time of the original hearing, the absence of which can be shown to have had a detrimental impact on the outcome of the hearing.

> b. Procedural error that can be shown to have had a detrimental impact on the outcome of the hearing.

> c. Errors in the interpretation of University policy so substantial as to deny either party a fair hearing.

> d. Grossly inappropriate sanction having no reasonable relationship to the charges.

*Id.*, Part 12.3.

184.    On May 16, 2017, John Doe timely submitted a 10-page appeal, which addressed Syracuse's specific grounds for appeal b, c, and d.  RP submitted no response to this appeal.

185.    The Syracuse appeals panel was composed of Chair Maria Lopez, Counselor in Syracuse's Student Support Services Program, and Jim Byrne, Assistant Dean of Student Services, and Kevin Costello, Assistant Director, Budget and Operations of the Syracuse Office of Student Activities.  The panel considered John Doe's detailed, 10-page submission for less than 20 minutes before affirming the Board's decision—without any record of the hearing to review.

186.     The wrongful investigation and decision resulted in John Doe's permanent expulsion from Syracuse.  He has been unable to complete his Masters degree in forensic science and has a permanent mark on his transcript indicating a conduct code violation, which he must disclose to any future university or employer to which he applies.

187.     Without correcting and expunging his transcript, his career will suffer permanent damage.  His professional future has been permanently blighted.  Syracuse has blocked his career path in forensic science by erroneously labeling him a sex offender.  He has been unable to enroll in a new University to pursue graduate studies.  John Doe has been forced to take jobs far below the level he would have attained with his forensic science degree.

V.    **CAUSES OF ACTION**

**COUNT 1:**   **Gender Discrimination by Application of Archaic Assumptions**
**Title IX**
**(Syracuse)**

188.     Plaintiff restates, realleges, and incorporates by reference all allegations set forth in every preceding paragraph as if set forth in this paragraph in full.

189.     Title IX provides, in relevant part, that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a).  All educational institutions that receive federal funding, as does Syracuse, may be held liable under Title IX under a private right of action.

190.     Syracuse applied archaic stereotypes of gender in presuming John Doe "responsible" for sexual assault because he was a male and expressed sexual desire, which Syracuse took as evidence of "rape culture" and sexual aggression.  Syracuse applied archaic sexual stereotypes to RP, as an alleged female victim, as the passive target of male desire.

48

191.    In the fall of 2016 and for years prior to the time in which John Doe became involved with RP, Syracuse faced public pressure from students, from the media, and from organs of state and federal government such as the OCR to reform a supposed campus "rape culture." Rape culture was attributed exclusively to men. There is no female "rape culture," in which women supposedly sexually assault men with impunity.

192.    In or around 2016 and 2017, and prior to brining a complaint against John Doe, Syracuse took active steps to increase the number of Title IX cases against male students. Syracuse presumed male students responsible for sexual assault by virtue of archaic assumptions about male sexual desire. Simultaneously, in practice and in violation of its own policies, Syracuse relaxed the standards of evidence for alleged female victims and applied lax investigatory techniques to accusing students. It also increased the sanctions imposed on male students accused of sexual assault, which became punitive rather than educational, also in violation of Syracuse policies and procedures.

193.    Applying gender-biased techniques such as the so-called trauma-informed interview, Investigator Jacobson and others assessed every inconsistency of the female student, RP, as evidence that a sexual assault had actually taken place. Investigator Jacobson and Syracuse took at face value RP's changing and escalating statements that she had been in "shock," despite her earlier statements that she was neither fearful or upset by contact with John Doe.

194.    RP's inconsistencies included:

    a.  Alleging she had been traumatized and "in shock" only on January 25, 2017, after failing to mention this important fact in two previous interviews (November 15, 2016 and December 6, 2016) and even reporting that she was "not fearful or upset" by contact with John Doe to the Syracuse Police (December 2, 2016). She then escalating her

allegations and insisting that she had "been forced to live my life in a constant state of fear" (April 24, 2017 response to Jacobson Report).

b.  Alleging first that no sex acts on November 13, 2016 had been consensual (on November 15, 2016); but later admitting that she had "kissed [John Doe] back" and "ended up on top of [John Doe] … remain[ing] on top of him for a few minutes" (December 6, 2016).

c.  Alleging an attempted vaginal rape prior to November 13, 2016 despite previously alleging that all prior acts had been consensual.

d.  Alleging no facts consistent with John Doe's forcing her to perform oral sex on him.

e.  Alleging no facts consistent with John Doe's forcing her to be on top of him (she alleged only that "she found herself on top of" John Doe).

Nevertheless, Investigator Jacobsen and the Jacobson Report assessed RP as "credible and the information she provides is reliable" (without applying a preponderance of the evidence standard). The Board followed this assessment.

195.    Investigator Jacobson is a trained victims advocate, and he advocated for the alleged victim, RP, rather than providing an unbiased report. By contrast, Syracuse handled John Doe as a criminal from the start, subjecting him to interrogation by a trained detective, Officer James Hill of the Syracuse DPS, to whom John Doe made a statement.

196.    Notwithstanding this difference in treatment, John Doe's account of events remained consistent, despite giving two statements three months apart, one to the Syracuse Police on December 16, 2016 and one to Detective Hill on March 15, 2017.

197.    Yet Investigator Jacobson refused to assess John Doe as "credible." Investigator Jacobson signaled Syracuse's pre-judgment of John Doe by withholding the crucial finding of "credible" from him—despite never interviewing John Doe or observing his demeanor. Investigator Jacobson had no basis for any such assessment other than John Doe's written statement.

198.    Despite an averred admiration for "trauma-informed" techniques, Syracuse, including Investigator Jacobson and the Board, disregarded all undisputed evidence that John Doe had experienced emotional trauma due to the events of November 13, 2016 (and his prior sexual encounters with RP).  John Doe's emotional turmoil was due to his sincere and deeply held Christian beliefs—which he and RP shared.  Both RP and John Doe believed that they sinned by having consensual vaginal intercourse.  Both believed that they had failed to contain sinful urges outside of marriage.  John Doe also experienced emotional trauma over cheating on his previous girlfriend by "hooking up" with RP and twice called a counseling hotline to cope with his trauma.

199.    The only "trauma" that matters to Syracuse, however, is the trauma experienced by the alleged female victim.  That a male would experience trauma due to a sexual encounter does not fit with the archaic sexual stereotypes of aggressive male "rape culture" and passive female victimhood under which Syracuse operates.

200.    It was also sufficient for Syracuse to find John Doe "responsible" for "pre-meditated" sexual assault that he admitted to having sexual desire—despite no evidence of pre-meditated sexual assault.  This finding is also attributable to Syracuse's archaic theories of "rape culture" and passive female victimhood.  The Syracuse Board questioned John Doe's "sincerity" that he received verbal consent because he had admitted to "his desire and expectation of sexual contact."  By this archaic standard, any male student who has sexual desire for a female student is presumptively responsible for sexual assault.

201.    Syracuse has discriminated against John Doe on the basis of his gender as a male student by applying archaic assumptions of gender and is liable under Title IX.

202.     As a direct result of John Doe's expulsion due to Syracuse's erroneous and biased proceedings, he has sustained damages.  Syracuse has forestalled the completion of his Masters in Forensic Science, which he was one course away from completing in spring 2016.  John Doe has suffered emotional distress, psychological damage, loss of income, forfeited tuition and fees, reputational damage, diminished career opportunities, and other direct and consequential damages in an amount to be determined at trial.

203.     John Doe is entitled to recovery of all direct and indirect damages, post-and prejudgment interest, reasonable attorney's fees and costs.

## COUNT 2:   Erroneous Outcome under Title IX
### (Syracuse)

204.     Plaintiff restates, realleges, and incorporates by reference all allegations set forth in every preceding paragraph as if set forth in this paragraph in full.

205.     Title IX provides, in relevant part, that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a).  All educational institutions that receive federal funding, as does Syracuse, may be held liable under Title IX under a private right of action.

206.     Under regulations promulgated by the federal government to implement Title IX, all institutions of higher learning that receive federal funding must implement procedures for the prompt and equitable resolution of complaints of sexual discrimination, including but not limited to sexual harassment, sexual assault, stalking, and intimate partner violence.  *See e.g.*, 34 C.F.R. § 688.46; 34 C.F.R. § 106; 34 C.F.R. § 54.

207.     Syracuse sets forth its policies for the implementation of Title IX to conform to federal law and regulations in its handbooks, websites, and policies, including, among others, its

Title IX Policy, Conduct System Handbook, Statement of Student Rights, and Sexual

Harassment, Abuse, and Assault Prevention.

208.   Syracuse expressly promises students subject to its disciplinary proceedings under

Title IX that they shall receive "FUNDAMENTAL UNFAIRNESS." *See e.g.*, Statement of

Student Rights and Responsibilities, ¶ 9.  Under Syracuse's policies, "fundamental fairness"

includes adequate written notice.

209.   In violation of federal law and regulations as well as in violation of its own

policies and procedures, Defendants failed to provide John Doe with fair, prompt, or equitable

proceedings in response to a complaint of sexual misconduct.

210.   Defendants failed, among other things, to provide the following:

    a.  Provide John Doe with sufficient notice of the charges against him.  John Doe received notice of the charges against him only in the April 17, 2017 Jacobson Report.  John Doe has never received a copy of the Title IX complaint against him.

    b.  Provide John Doe with all evidence that would be considered against him.

    c.  Provide prompt proceedings. Syracuse dragged out its proceedings against John Doe through May 2017, ***seven months*** after Syracuse's received notification of allegations of sexual assault raised by RP (first made November 15, 2016).

    d.  Provide a hearing before an unbiased decision maker.  Syracuse provided biased proceedings guided by selectively applied "trauma-informed" techniques, archaic stereotypes of male sexual desire and passive female victimhood.

    e.  Application of the preponderance standard of evidence.  Syracuse presumed John Doe responsible.

211.   John Doe's case came down to his account of events against the say-so of his

accuser, RP.  In finding John Doe responsible, Defendants acted on bias against him by, among

other acts and omissions, the following:

a.  Defendants accepted the female accusing student's (RP's) account of events at face value, despite obvious inconsistencies and refused to credit John Doe' consistent account of events.

b.  Investigator Jacobson applied a biased theory of "trauma informed" interviews, of which he has expressed enthusiasm on LinkedIn among other venues.  As practiced by Investigator Jacobsen, inconsistencies in the accounts of alleged female victims evince credibility due to "trauma," whereas consistency in the accounts of male accused students become evidence of the opposite and discredit the male students. Investigator Jacobson applied "trauma-informed" techniques despite the absence of any credible evidence that RP experienced trauma.  Despite undisputed evidence that John Doe experienced trauma, Investigator Jacobson refused to assess John Doe's account of events as "credible," because he does not apply "trauma informed" techniques to accused male students.  Trauma could not enhance John Doe's credibility, only RP's, despite her admissions that she was neither fearful or upset by contact with John Doe.

c.  Investigator Jacobson did not assess John Doe's consistent testimony as "credible" in the Jacobson Report, but had no basis for doing so because he did not interview John Doe personally or observe his demeanor.

d.  On information and belief, Investigator Jacobson, does not assess accused male students as "credible," but will give the assessment of "credible" only to alleged female victims.

e.  Syracuse's Board expressly found that RP had not been truthful in denying any and all consent to sexual contact with John Doe on November 13, 2016.  The Board found, among other things, that RP had in fact consented to going with John Doe to his apartment, kissing and "making out" with John Doe, and being carried to the bedroom for further kissing.

f.  The Board also rejected RP's accusation that John Doe attempted vaginal rape prior to November 13, 2016.

g.  Defendants demonstrated gender bias toward John Doe in weighing evidence of his sexual desire as evidence of sexual assault.  John Doe admitted to feelings of desire for RP but expressly denied acting on that desire without her express consent.  Yet the Board employed archaic assumptions and stereotypes of uncontrollable male sexuality and counted John Doe's frank admission of sexual desire as evidence of premeditated sexual assault.  This archaic assumption was part and parcel of Syracuse's ongoing activism against supposed male "rape culture."  Syracuse never asked RP about her sexual desire for John Doe, neither through Investigator Jacobson or through the Board.

h.  Defendants' erroneous and unsupportable decision to find John Doe responsible for sexual assault occurred at a time when the OCR was investigating Syracuse for alleged failures to adequately address female students' complaints of sexual misconduct.  Syracuse initiated the complaint against John Doe only on January 25, 2017, the day after OCR came to campus to investigate Syracuse—after doing nothing for over two months.  Then Syracuse launched its complaint and investigation without providing notice to John Doe.

i.  Syracuse's erroneous decision to find John Doe responsible for sexual assault came in direct response to public pressure in the media and from within its student body to address a supposed "rape culture" on campus, exclusively associated with male students.  There is no female "rape culture," a concept that never comes up at Syracuse.

212.  Syracuse has demonstrated a pattern of inherent and systematic gender bias and discrimination against male students accused of sexual misconduct that has contributed to its procedural errors.

213.  Syracuse procedural errors, gender bias, and discriminatory investigation and hearing led to an erroneous outcome when John Doe was found responsible and expelled.

214.  As a direct result of John Doe's expulsion as a sanction for Syracuse's erroneous and biased proceedings, he has sustained damages.  Syracuse has forestalled the completion of his Masters in Forensic Science, which he was one course away from completing in the spring of 2017.  John Doe has suffered emotional distress, psychological damage, loss of income, forfeited tuition and fees, reputational damage, diminished career opportunities, and other direct and consequential damages in an amount to be determined at trial.

215.  John Doe is entitled to recovery of all direct and indirect damages, post-and prejudgment interest, reasonable attorney's fees and costs.

### <u>COUNT 3:</u>  Selective Enforcement under Title IX
### (Syracuse)

216.  Plaintiff restates, realleges, and incorporates by reference all allegations set forth in every preceding paragraph as if set forth in this paragraph in full.

217. Title IX provides, in relevant part, that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). All educational institutions that receive federal funding, as does Syracuse, may be held liable under Title IX under a private right of action.

218. Syracuse was encouraged by the OCR as well as public pressure to hire, among others, Investigator Jacobson as a victim's advocate rather than an unbiased, objective investigator. Investigator Jacobson and others viewed their job as to support the perceived vulnerability of women to Syracuse "rape culture."

219. Syracuse adopted "trauma-informed" techniques in order to enhance the credibility and lower the standards of evidence in order to find alleged female victims "credible." "Trauma-informed" techniques, as applied by Syracuse, undermine the credibility of and increase the burden of proof imposed on accused male students.

220. As practiced by Syracuse, and in particular by Investigator Jacobson and the hearing Board that heard John Doe's case, it is only the alleged "trauma" of female students that requires "trauma-informed" techniques. There is no "trauma-informed" approach to the emotional turmoil and anguish of accused male students like John Doe.

221. "Trauma-informed" techniques as applied at Syracuse convert inconsistencies in statements by alleged victims into evidence of credible victimization at the hands of male perpetrators; whereas the techniques convert consistent testimony given by accused male students into evidence of premeditated and practiced sexual assault.

222. John Doe experienced trauma due to the perception that he had sinned against his deepest Christian values when he and RP had a consensual sexual relationship. But Syracuse

selectively applies "trauma-informed" techniques and refused to credit John Doe's account of trauma—which was undisputed and also attested to by RP.  By contrast, RP's inconsistent account of supposed trauma was credited by Syracuse due to no more than her say-so that she "might have" experienced "shock."

223.    Syracuse selectively enforces its policies and procedures applicable to sexual misconduct and Title IX by applying, without limitation, different standards of its "trauma-informed" techniques to men and women, despite the fact that they are similarly situated.  John Doe and RP's trauma, to the extent it existed, arose from the same events, but Syracuse weighed only RP's allegations of trauma as enhancing her credibility.

224.    Because Syracuse selectively enforced its Title IX Policy against John Doe, he was wrongfully found responsible and expelled.

225.    As a direct result of John Doe's expulsion as a sanction for Syracuse's erroneous and biased proceedings, he sustained damages.  Syracuse has forestalled the completion of his Masters in Forensic Science, which he was one course away from completing in the spring of 2017.  John Doe has suffered emotional distress, psychological damage, loss of income, forfeited tuition and fees, reputational damage, diminished career opportunities, and other direct and consequential damages in an amount to be determined at trial.

226.    John Doe is entitled to recovery of all direct and indirect damages, post-and prejudgment interest, reasonable attorney's fees and costs.

## <u>COUNT 4:</u>   Breach of Contract (Syracuse)

227.    Plaintiff restates, realleges, and incorporates by reference all allegations set forth in every preceding paragraph as if set forth in this paragraph in full.

228.    Upon matriculating at Syracuse, John Doe entered into a contract with the university comprised of the policies and procedures promulgated by Syracuse as applicable to all students in exchange for their tuition.  These policies included, without limitation, the following:

    a.   Syracuse' is Title IX Policy;

    b.   Syracuse's Conduct System Handbook;

    c.   Syracuse's Statement of Student Rights;

    d.   Syracuse's policy captioned "Sexual Harassment, Abuse, and Assault Prevention"; and

    e.   Syracuse's policy captioned "Sexual Activity, Non-Consensual."

229.    These policies promised John Doe specific, enforceable rights, including but not limited to the following:

    a.   Notice of the charges and complaint filed against him.  Conduct System Handbook, Part 10.15, Bill of Rights, ¶ 4; Statement of Student Rights, ¶ 9;

    b.   The right to be notified of any no contact orders issued against him and the right to be issued a copy in writing.  Conduct System Handbook, Part 4.7, 4.8.

    c.   The right to have no contact orders issued symmetrically, rather than in a biased fashion such that the male accused student bears the entire burden of abiding by the NCO.  Conduct System Handbook, Part 4.7.

    d.   The right to have Title IX proceedings conducted within 60 days of the original complaint, pending only "special circumstances," of which there were none in this case.  Conduct System Handbook, Part 10.21.

    e.   The right to be notified in written form "if circumstances arise that delay[] either the investigation or the Board's determination of an outcome … and its cause."  *Id*.

    f.   The right to have sanctions imposed that are not disproportionate to the student misconduct alleged, and which advance educational rather than punitive goals.  Conduct System Handbook, Part 11.1(a).

    g.   The right to have Syracuse apply a preponderance of the evidence standard rather than biased standards of evidence that privilege the

statements of alleged female victims over those of accused male students.  Conduct System Handbook, Part 5.3.

230.   Syracuse breached its contractual obligations to John Doe by failing to follow

each of its own policies enumerated above by, without limitation:

    a.   Issuing an NCO to John Doe on November 15, 2017 but then keeping it secret for over two weeks, causing further conflict between John Doe and RP.

    b.   Issuing a secret NCO to John Doe on November 15, 2017 without issuing a symmetrical NCO to RP.

    c.   Dragging out proceedings against John Doe for over seven months after Syracuse first became aware of the allegations without any "special circumstances" to justify the delay.

    d.   Failing to provide sufficient notice to John Doe of the charges, complaint, or evidence against him.  The first Notice John Doe received of the specific allegations against him was in the Jacobson Report of April 17, 2017, at the end rather than the outset of Syracuse's inquisitorial proceedings.

    e.   Failing to apply the preponderance standard and instead applying biased evidentiary standards based in "trauma informed" techniques, among others.  Had the preponderance standard been applied in this "he said/she said" case, where John Doe's account was consistent but the accusing student's account was contradictory and motivated by conflicted feelings of compromised religious faith and sexual insecurity in the loss of her own and John Doe's virginity, a finding of "not responsible" would have been the only conceivable outcome.

    f.   Failure to provide fair and unbiased proceedings in breach of Syracuse's express promise of fundamental fairness.

231.   Syracuse's breach of contract, motivated by discriminatory intent, was conscious, willful, and deliberately disregarded Plaintiff John Doe's interests.

232.   Because of Syracuse breached contract by failing to follow its own policies, John Doe has been damaged.  Syracuse forestalled the completion of John Doe's Masters in Forensic Science, which he was one course away from completing in the spring of 2017.  John Doe has suffered emotional distress, psychological damage, loss of income, forfeited tuition and fees,

reputational damage, diminished career opportunities, and other direct and consequential damages, as well as punitive damages, in an amount to be determined at trial.

### COUNT 5:   Breach of the Covenant of Good Faith and Fair Dealing
### (Syracuse)

233.    Plaintiff restates, realleges, and incorporates by reference all allegations set forth in every preceding paragraph as if set forth in this paragraph in full.

234.    At all times relevant to this Complaint, a contractual relationship existed between Syracuse and John Doe, as embodied in promises made to John Doe in Syracuse's handbooks, policy manuals, and websites.  These policies included, without limitation, Syracuse's Title IX Policy, Syracuse's Conduct System Handbook, Syracuse's Statement of Student Rights, and Syracuse's policy captioned "Sexual Harassment, Abuse, and Assault Prevention."

235.    Syracuse's contracts contained an implied covenant of good faith and fair dealing. In particular, Syracuse implicitly guaranteed that any proceedings for student code of conduct violations would be conducted with fundamental fairness.

236.    Syracuse breached the implied covenant of good faith and fair dealing with John Doe by, among other things, adjudicating a complaint of sexual misconduct against him with bias, which resulted in his expulsion.

237.    Syracuse's unfair, bad faith adjudication included, among other things, the following:

   a.  Issuing an NCO to John Doe on November 15, 2017 but then keeping it secret for over two weeks, causing further conflict between John Doe and RP.

   b.  Issuing a secret NCO to John Doe on November 15, 2017 without issuing a symmetrical NCO to RP.

   c.  Dragging out proceedings against John Doe for over seven months after Syracuse first became aware of the allegations without any "special circumstances" to justify the delay.

d.  Failing to provide sufficient notice to John Doe of the charges, complaint, or evidence against him. The first Notice John Doe received of the specific allegations against him was in the Jacobson Report of April 17, 2017, at the end rather than the outset of Syracuse's inquisitorial proceedings.

e.  Failing to apply the preponderance standard and instead applying biased evidentiary standards based in "trauma informed" techniques, among others. Had the preponderance standard been applied in this "he said/she said" case, where John Doe's account was consistent but the accusing student's account was contradictory and motivated by conflicted feelings of compromised religious faith and sexual insecurity in the loss of her own and John Doe's virginity, a finding of "not responsible" would have been the only conceivable outcome.

f.  Failure to provide fair and unbiased proceedings in breach of Syracuse's express promise of fundamental fairness.

238.  Syracuse knowingly, intentionally, and in bad faith acted on its bias against accused male students by applying archaic stereotypes of male sexual desire, employing "trauma informed" investigation techniques, failing to fully and fairly investigate allegations made by the female accusing student, RP—instead considering her to be a passive female victim—in addition to other discriminatory methods and proceedings that Syracuse applied to John Doe.

239.  Syracuse's breach of the covenant of good faith and fair dealing caused John Doe damages, in an amount to be determined at trial, including but without limitation, emotional and psychological harm, loss of educational and career opportunity, diminished income, reputation damage, forfeited tuition and fees, and other direct and indirect damages.

240.  John Doe is therefore entitled to recover his damages, including attorney fees and costs.

### COUNT 6:  Negligence (All Defendants)

241.  Plaintiff restates, realleges, and incorporates by reference all allegations set forth in every preceding paragraph as if set forth in this paragraph in full.

242.     Having put in place a student disciplinary process and promised students such as John Doe fundamental fairness as well as due process protections embodied in the right to timely notice and a fair hearing before unbiased decision makers, Syracuse adopted and owed a duty of care to John Doe.  Defendants owed a duty to John Doe to conduct its Title IX process with the care and diligence of a reasonable institution in its position, including through the hiring, training, and supervision of unbiased administrators.

243.     This duty is also imposed by Federal law, including, among others, by Title IX and the Clery Act and their implementing regulations.

244.     Syracuse also adopted a duty through its accreditation under the Middle States Commission on Higher Education, the accreditation standards of which require that Syracuse commit itself to "policies and procedures [that] are fair and impartial, and assure that grievances are addressed promptly, appropriately, and equitably." *See* Standards for Accreditation and Requirements of Affiliation, Thirteenth Edition.

245.     Syracuse officials who directed and implemented that process within the scope of their employment, such as but without limitation, Investigator Jacobson, Chief Title IX Officer Johnson-Willis, Carrie Grogan Abbott, and others, owed John Doe the same duty of care. Syracuse was directly responsible for their training and oversight.  Chief Title IX Officer Johnson-Willis was directly responsible for the training and oversight of Investigator Jacobson, Carrie Grogan Abbott, and others.  Syracuse is responsible for the negligence of those acting on its behalf under the theory of *respondeat superior*.

246.     The conduct of Syracuse in conducting an investigation fell below the applicable standard for conducting investigations into, and adjudicating allegations of, sexual misconduct. Chief Title IX Investigator Johnson-Willis and Investigator Jacobson were also negligent.  They

knew or should have known that the techniques of investigation and the biases applied through Syracuse's Title IX office fell below accepted standards of fundamental fairness as promised by Syracuse.  The investigation and proceedings against John Doe amounted to breaches of Defendants duty of care.

247.   Defendants' negligent conduct included, but was not limited to:

a. Issuing an NCO to John Doe on November 15, 2017 but then keeping it secret for over two weeks, causing further conflict between John Doe and RP.

b. Issuing a secret NCO to John Doe on November 15, 2017 without issuing a symmetrical NCO to RP.

c. Dragging out proceedings against John Doe for over seven months after Syracuse first became aware of the allegations without any "special circumstances" to justify the delay.

d. Failing to provide sufficient notice to John Doe of the charges, complaint, or evidence against him.  The first Notice John Doe received of the specific allegations against him was in the Jacobson Report of April 17, 2017, at the end rather than the outset of Syracuse's inquisitorial proceedings.

e. Failing to apply the preponderance standard and instead applying biased evidentiary standards based in "trauma informed" techniques, among others.  Had the preponderance standard been applied in this "he said/she said" case, where John Doe's account was consistent but the accusing student's account was contradictory and motivated by conflicted feelings of compromised religious faith and sexual insecurity in the loss of her own and John Doe's virginity, a finding of "not responsible" would have been the only conceivable outcome.

f. Failure to provide fair and unbiased proceedings in breach of Syracuse's express promise of fundamental fairness.

248.   Defendants, including the individual Defendants, breached their duty to John Doe and proximately caused John Doe damages in the form of expulsion from Syracuse, emotional and psychological harm, reputational damage, diminished educational and career opportunities, lost income, and other direct and indirect damages.

249.     Defendants are therefore liable to John Doe for damages in an amount to be determined at trial, including pre-and post-judgment interest, punitive damages, attorney's fees, and costs.

### COUNT 7:   Gross Negligence (All Defendants)

250.     Plaintiff restates, realleges, and incorporates by reference all allegations set forth in every preceding paragraph as if set forth in this paragraph in full.

251.     Having adopted voluntarily or through statute the obligations to John Doe set forth in Count 6, Defendants owed John Doe a duty.

252.     Syracuse officials who directed and implemented the Title IX process within the scope of their employment, such as but without limitation, Investigator Jacobson, Chief Title IX Officer Johnson-Willis, Carrie Grogan Abbott, and others, owed John Doe the same duty of care. Syracuse was directly responsible for their training and oversight.  Chief Title IX Officer Johnson-Willis was directly responsible for the training and oversight of Investigator Jacobson, Carrie Grogan Abbott, and others.  Syracuse is responsible for the negligence of those acting on its behalf under the theory of *respondeat superior*.

253.     Defendants breached their duty to John Doe as set forth, without limitation, in Count 6 and proximately caused John Doe harm in the form of expulsion from Syracuse, emotional and psychological harm, reputational damage, and other direct and indirect damages.

254.     Defendants' breach of duty was knowing and willful, in particular the application of bias.  Syracuse was motivated by discriminatory intent and acted with a conscious disregard for John Doe's rights or was so reckless in its treatment of John Doe so as to amount to such disregard of his rights.

255.     Syracuse is therefore liable to John Doe for his damages in an amount to be determined at trial, including pre-and post-judgment interest, punitive damages, attorney's fees, and costs.

**COUNT 8:**   **Violation of John Doe's Constitutional Right to**
**Due Process under the New York State Constitution, Art. I, § 6**
**(All Defendants)**

256.     Plaintiff restates, realleges, and incorporates by reference all allegations set forth in every preceding paragraph as if set forth in this paragraph in full.

257.     Under the New York State Constitution, Art. I, § 6 (Bill of Rights), John Doe may not be deprived of life, liberty or property without due process of law.

258.     On July 7, 2015, New York State Governor Andrew Cuomo signed into law Education Law Article 129-B ("Art. 129-B"), commonly known as "Enough is Enough," which became effective on October 5, 2015.  *See* NY Educ. L. § 6438 et seq.  By enacting Art. 129-B, New York State significantly involved itself and become a meaningful participant in the otherwise private conduct of private universities such as Syracuse.

259.     Art. 129-B applies to all public and private institutions of higher education in the State of New York.  It mandates that all such institutions adopt certain rules and procedures in connection with their sexual misconduct policies.

260.     Under public, governmental pressure to address the supposed "rape culture" of Syracuse's male student body, Syracuse Chancellor Kent Syverud adopted the "Enough is Enough" legislation in summer 2015, making him the first head of a private university to do so.

261.     On August 30, 2015, Chancellor Syverud stated that he was "proud that Syracuse University was the first private university in New York State to endorse 'Enough is Enough,' and that he [was] pleased with the progress the community has made in recent years."  (*See 'Enough is Enough' affects SU's sexual assault policy, changes definition of consent*, Daily Orange

(August 30, 2015) (available at http://dailyorange.com/2015/08/enough-is-enough-affects-sus-sexual-assault-policy-changes-definition-of-consent/)).

262.     Katelyn Cowen, Syracuse's director of the Office of Health Promotion, also stated that "Enough is Enough has changed expectations" at Syracuse.  *Id.*

263.     Thus, Syracuse demonstrated zeal in becoming the agent of Art. 129-B's implementation in many ways, including without limitation through Kevin Quinn, Senior Vice President for Public Affairs.  Senior Vice President Quinn told the Daily Orange, "We are very pleased that it was passed by the Legislature and will become law."  *Id.*

264.     Syracuse and its agents and employees have become state actors in the implementation of Syracuse's Title IX policies and procedures.

265.     As a direct result of Defendants' actions, including but not limited to expelling John Doe, which they undertook under the color of state law, John Doe lost his protected liberty interest in his good name, reputation, honor, and integrity.  John Doe lost his property interest in the education he had paid for in the Forensic Science program at Syracuse.

266.     By mandate of New York law, John Doe's Syracuse transcript now permanently reflects that he was expelled for a code of conduct violation which has blighted John Doe's chances of continuing his education.  John Doe has been unable to continue and complete his graduate education to the present day.

267.     Syracuse deprived John Doe of his liberty interests and property interests in his education, causing him both reputational harm, and causing him direct and indirect damages without due process of law.

268.     Among Syracuse's due process violations, Syracuse failed to timely notify John Doe of the charges against him, failed to permit him to present witnesses in his defense, and

failed to provide him with an unbiased hearing and denied him meaningful cross examination or to hear the evidence against him.

269.    John Doe is entitled to damages in an amount to be determined at trial, plus pre- and post-judgment interest, attorney's fees and costs.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff John Doe prays that this Honorable Court grant the following relief:

i.      Declare Defendants Syracuse University and Syracuse Board of Trustees liable for discrimination against Plaintiff John Doe on the basis of sex in violation of Title IX, 20 U.S.C. 1681, et seq.;

ii.     Declare Defendants Syracuse University and Syracuse Board of Trustees in breach of its contract with Plaintiff John Doe, in breach of the implied covenant of good faith and fair dealing;

iii.    Declare all Defendants negligent in their investigation of code of conduct complaint and in their expulsion of Plaintiff John Doe;

iv.     Declare all Defendants in violation of the Constitution of the State of New York, Art. Art. I, § 6 due to the deprivation of Plaintiff John Doe's liberty and property interests without due process of law;

v.      Order Defendants to pay John Doe all direct and indirect damages caused by their statutory violation of Title IX, breaches of contract, negligence and gross negligence, and violation of Plaintiff John Doe's constitutional rights;

vi.     Order Defendants Syracuse University and Syracuse Board of Trustees to expunge Plaintiff John Doe's transcript and university record of any reference to the wrongful expulsion and finding of "responsibility" for sexual misconduct;

vii.    Order Defendants to pay punitive damages for willful disregard of the rights of John Doe;

viii.   Order Defendants to pay John Doe's reasonable attorney fees and costs under 42 U.S.C. § 1988(b) and other applicable laws; and

ix.     Order such additional legal or equitable relief as the Court finds just and proper.

## JURY DEMAND
## PLAINTIFF JOHN DOE DEMANDS A JURY TRIAL ON ALL CLAIMS SO TRIABLE

Respectfully submitted,

_____

Michael Thad Allen, Esq. (Bar No. 700491)
ALLEN LAW, LLC
PO Box 404
Quaker Hill, CT  06375
(860) 772-4738
m.allen@allen-lawfirm.com

Julie E. Burt
     *pro hac vice motion to be filed*
LAW OFFICE OF JULIE E. BURT
128 Garden Street
Farmington, CT 06032
(860) 261-4567
attnyjulie@comcast.net

for PLAINTIFF