**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

JOHN DOE,

                                    Plaintiff,                         5:19-cv-00190 (BKS/ATB)

v.

SYRACUSE UNIVERSITY, SYRACUSE UNIVERSITY
BOARD OF TRUSTEES, SHEILA JOHNSON-WILLIS,
in her individual capacity, and BERNERD JACOBSON, in
his individual capacity,

                                    Defendants.

**Appearances:**

*For Plaintiff:*
Michael Thad Allen
Allen Law, LLC
P.O. Box 404
Quaker Hill, CT 06375

Julie E. Burt
Law Office of Julie E. Burt
128 Garden Street
Farmington, CT 06032

*For Defendants:*
Edward G. Melvin
Barclay Damon LLP
Barclay Damon Tower
125 East Jefferson Street
Syracuse, NY 13202

**Hon. Brenda K. Sannes, United States District Judge:**

**MEMORANDUM-DECISION AND ORDER**

## I.      INTRODUCTION

        Plaintiff John Doe brings this action alleging: (1) violations under Title IX of the

Education Amendments of 1972, 20 U.S.C. § 1681 *et seq.* ("Title IX") (First, Second, and Third

Claims); (2) breach of contract (Fourth Claim); (3) breach of the implied covenant of good faith and fair dealing (Fifth Claim); (4) negligence (Sixth Claim); (5) gross negligence (Seventh Claim); and (6) violation of Art. I, § 6 of the New York State Constitution's Due Process Clause (Eighth Claim). (Dkt. No. 1). Defendants Syracuse University, the Syracuse University Board of Trustees (the "Syracuse Defendants"), Sheila Johnson-Willis, and Bernerd Jacobson (the "Individual Defendants") move to partially dismiss the Complaint. (Dkt. No. 20). The parties have filed responsive papers. (Dkt. Nos. 27, 28). For the reasons that follow, the motion is granted in part and denied in part.

## II.     FACTS[1]

### A.     The Encounters Between RP[2] and Plaintiff

Plaintiff and RP "met at church in their home state and, when they arrived in Syracuse for school in August 2016, "began spending time together on a regular basis," including by attending church together. (Dkt. No. 1, ¶¶ 21, 23–25). As their relationship evolved, "balancing their mutual attraction, their commitments to others, and their Christian values became increasingly conflicted." (*Id.* ¶ 26). Neither Plaintiff nor RP "had "extensive sexual experience." (*Id.*). The two "disclosed . . . that they were still virgins." (*Id.*). Both "had resolved to remain abstinent until marriage and remained committed to that resolution." (*Id.*).

Plaintiff and RP had three sexual encounters. (*Id.* ¶¶ 27–49). Each encounter "developed in the same pattern" in which RP demonstrated her "affirmative consent at every stage." (*Id.* ¶ 32).

---

[1] The facts are drawn from the Complaint, (Dkt. No. 1), as well as some of the documents attached to Defendants' motion to dismiss. *See infra* Section IV.A. The Court assumes the truth of, and draws reasonable inferences from, the well-pleaded factual allegations. *Faber v. Metro. Life Ins. Co.*, 648 F.3d 98, 104 (2d Cir. 2011).

[2] As in the Complaint, the Court refers to the alleged sexual assault victim as RP.

### 1.   October 11, 2016 – First Sexual Encounter

On October 11, 2016, Plaintiff called RP to ask if she wanted to "hang out." (*Id.* ¶ 27). RP "said she would like to get together," and "later divulged that her current boyfriend had broken up with her." (*Id.*). The two had dinner. (*Id.*). After dinner, RP "continued to seek support from Plaintiff and asked to go to his apartment where she continued to talk." (*Id.* ¶ 28).

As they sat on the couch, the two "had their arms around each other and eventually began to kiss." (*Id.*). The encounter progressed to "mutual fondling," and the two "agreed to move into [Plaintiff's] bedroom." (*Id.* ¶ 29). They then "mutually agreed to remove each other's clothing as evidenced by their simultaneous actions and desires." (*Id.*). Plaintiff "picked [RP] up and carried her, and [RP] demonstrated her active participation by wrapping her legs around [Plaintiff's] waist." (*Id.*). "RP was an active, willing, and assertive participant" in the sexual encounter. (*Id.*). The two "attempted vaginal intercourse but without success." (*Id.*).

After the encounter, Plaintiff "felt conflicted, and RP stated she still had feelings for her recent ex-boyfriend." (*Id.* ¶ 30). The two "also discussed how they both believed their encounter had violated their Christian values." (*Id.*). Plaintiff regretted being in a relationship with another woman. (*Id.* ¶ 31). Plaintiff felt "such emotional anguish" that RP "offered to take him to the hospital," but he "refused this assistance." (*Id.*). That night, Plaintiff "sought professional support independent of RP." (*Id.*).

### 2.   October 24, 2016 – Second Sexual Encounter

During the two weeks after their October 11th encounter, Plaintiff and RP "continued to struggle with feelings of guilt." (*Id.* ¶ 33). Plaintiff "experienced emotional trauma over cheating on his . . . girlfriend by 'hooking up' with RP." (*Id.* ¶ 198). Plaintiff told his girlfriend, and his relationship with his girlfriend "ended as a result of the confession." (*Id.* ¶ 33). Plaintiff "continued to independently seek emotional support during this time from a Christian

Counselor." (*Id.*). Plaintiff and RP "continued to have feelings for each other." (*Id.* ¶ 34). On multiple occasions, they discussed whether they should "avoid 'hanging out' to ward off the temptation of another sexual encounter." (*Id.*). "By the weekend of October 22/23, 2016," the two "discussed the effect of their behavior on their relationship and expressed that they would each seek forgiveness as they were taught by their Christian upbringing and values." (*Id.*).

On October 24th, they originally planned to meet at a coffee shop, "but instead, RP voluntarily drove to [Plaintiff's] apartment around 5:00 p.m." and went inside. (*Id.* ¶ 35). Plaintiff discussed his "feelings about his break up and about his Christian values." (*Id.*). The two agreed to stay at Plaintiff's apartment to talk, and "soon they both began to be intimate, which again evolved into a sexual encounter." (*Id.* ¶ 36). They began to kiss and "agreed through their actions and words to move to [Plaintiff's] bedroom." (*Id.*). RP actively wrapped her legs and arms around [Plaintiff]" when he picked her up.  (*Id.*). The two "continued various sexual behaviors that they both enjoyed and desired to continue." (*Id.*). The two "attempted vaginal intercourse" "but again without success." (*Id.*). RP "gave affirmative consent to each specific sexual act." (*Id.* ¶ 38).

After the October 24th encounter, Plaintiff and RP "once again felt conflicted by their Christian values and their sexual desire." (*Id.* ¶ 41). The two "discussed RP's unstable and unpredictable relationship with another man, which increased her feelings of her wrongdoings during their sexual encounters." (*Id.*). "They discussed their need to avoid temptation and follow their Christian values, so they decided that it would be best if they stayed away from each other." (*Id.*). That evening, Plaintiff "again felt remorse for their behavior and again sought support" from a professional counselor." (*Id.*).

### 3.    November 13, 2016 – Third Sexual Encounter

On November 13th, Plaintiff went to church in Syracuse and saw RP there.  (*Id.* ¶ 43). RP "stated she had no money for lunch, and so [Plaintiff] invited her to have lunch at his apartment after church." (*Id.*). RP responded "that she would like to." (*Id.*). RP "later gave contradictory accounts," denying "wanting to come to [Plaintiff's] apartment even though she voluntarily drove her own car." (*Id.*). Once inside Plaintiff's apartment, "they began to kiss on [Plaintiff's] couch." (*Id.* ¶ 44). Throughout this time, "RP was an active and willing participant, and both parties mutually participated in the sexual behavior." (*Id.*).

As during the prior encounters, Plaintiff and RP "moved to his bedroom." (*Id.*). "RP again actively wrapped her legs around [Plaintiff] as he carried her to the bedroom." (*Id.*). They "removed each other's clothing and progressed to mutual fondling." (*Id.*). Plaintiff was "attentive to RP's desires and cues." (*Id.*) Plaintiff, being "conscious of RP's feelings and desires, asked RP if she wanted to stop 'making out.'" (*Id.*). "RP said yes, so [Plaintiff] immediately stopped his actions." (*Id.*).

RP remained next to Plaintiff and began "flirtatiously teasing him and touching him." (*Id.* ¶ 45). Plaintiff "responded to her and kissed her, and [RP] responded by kissing him back and fully and actively participat[ing] in the physical contact." (*Id.*). Plaintiff was "cognizant they were acting on mutual desires that they may both later regret." (*Id.*). RP said, "not to worry about it" and that it "didn't bother" her that "they were in a similar situation as their other two encounters." (*Id.*). After RP made those statements, Plaintiff asked "if they could 'make out' again, and RP . . . consented to kissing again." (*Id.* ¶ 46). As during the prior two occasions, the encounter progressed beyond making out. (*Id.*). The two "began undressing each other." (*Id.*). Plaintiff asked if he and RP "could again attempt vaginal sex." (*Id.* ¶ 47). RP "consented, agreed, and continued to engage in the sexual behavior." (*Id.*). On this occasion, "the two successfully

5

completed vaginal intercourse." (*Id.*). "All sexual acts" followed the "exact same pattern of voluntary, mutually consensual sex as in their prior encounters." (*Id.* ¶ 48).

Afterwards, Plaintiff and RP "talked about feeling remorse about their mutual desires, completing the sexual act, and conflict with their faith." (*Id.* ¶ 49). Both RP and Plaintiff "believed they had failed to contain sinful urges outside of marriage." (*Id.* ¶ 198). RP told Plaintiff that "she was conflicted due to her attempt to commit again to her other boyfriend." (*Id.* ¶ 49). She also told Plaintiff that "she was upset that she may not be a virgin anymore and expressed confusion about this point." (*Id.*). The two "agreed not to see each other to avoid temptation," and then "turned to small talk." (*Id.*).

### B.    RP Reports That Plaintiff Sexually Assaulted Her

Two days later, RP "discussed her sexual encounters with a Syracuse professor." (*Id.* ¶ 101). The professor "encouraged RP to rethink the consensual events of November 13, 2016 as non-consensual." (*Id.*). Syracuse did not investigate what the professor said or how RP's account to the professor differed from her other accounts of the events. (*Id.* ¶ 102). Plaintiff "was not provided the opportunity to find out what the professor said." (*Id.*). Plaintiff could not determine whether or not RP's statements to the professor were consistent with her contradictory reports to others. (*Id.*). At this time, RP "deleted all of her text messages between [Plaintiff] and herself, eliminating evidence of their consensual contact and communications."  (*Id.* ¶ 103).

### 1.    RP Gives Inconsistent Accounts of the November 13, 2016 Encounter, and the Syracuse Department of Public Safety ("DPS") Issues a No Contact Order

#### a.    RP's November 15, 2016 Account

On November 15, 2016, at approximately 3:12 p.m., RP reported a "sexual assault" to DPS Officer Matthew Zingaro. (*Id.* ¶ 104). Zingaro referred the matter to the Syracuse Police Department ("SPD") (*Id.*). Early that evening SPD Officer Marlena Jackson of the Criminal

Investigation Division interviewed RP on campus. (*Id.* ¶ 105). RP told Jackson that she "did not consent **to having any sexual relations** with" Plaintiff on November 13th. (*Id.* ¶ 105). RP admitted that the preceding "incidents [with Plaintiff] were consensual." (*Id.*).

### b.    DPS Issues an No Contact Order

After DPS "first received a report," it issued a No Contact Order dated November 15, 2016. (*Id.* ¶ 137). Plaintiff alleges that Syracuse violated its policy by failing to notify Plaintiff of this No Contact Order and by not issuing RP a "symmetrical" No Contact Order, instructing her to stay away from Plaintiff. (*Id.* ¶¶ 138–39, 229–30, 237). Plaintiff also alleges that Syracuse did not "inform RP that it would keep the . . . [No Contact Order] secret," which opened the door to her "accusations that [Plaintiff] was further violating Syracuse's rules by contacting her." (*Id.* ¶ 138).

On November 27, 2016, Plaintiff contacted RP and left a voicemail. (*Id.* ¶¶ 141–42). A week later, on December 2, 2016, RP complained to DPS that Plaintiff "had contacted her by voicemail the previous week." (*Id.* ¶ 141). RP admitted to DPS that Plaintiff "had not been inappropriate in any way" and that "she was not fearful or upset due to [Plaintiff]." (*Id.* ¶¶ 96, 141). RP however believed Plaintiff "was violating Syracuse rules and [that Plaintiff] had disobeyed the [No Contact Order]." (*Id.* ¶ 143). Because Syracuse kept the No Contact Order secret, Plaintiff "inadvertently . . . aggravate[d] RP." (*Id.* ¶¶ 143, 230(a)).

Syracuse's Office of Student Rights and Responsibilities informed Plaintiff of the No Contact Order's "existence" in a December 1, 2016 email. (*Id.* ¶ 144). The Office announced that it had "reviewed" the No Contact Order and "determined that it will remain in effect at this time," although Plaintiff "could not be aware of the [No Contact Order] in the first place." (*Id.*). This was Plaintiff's "first inkling" of any administrative action against him. (*Id.* ¶ 137).

### c.    RP's December 6, 2016 Account

RP's allegations of sexual assault "went through several permutations." (*Id.* ¶ 100). On December 6th, RP gave a "second, more extensive account to Officer Michael Murphy" of the SPD's Abused Persons Unit. (*Id.* ¶ 108). This time, RP addressed her struggle with her religious beliefs, explaining her desire to follow Christian teachings, which "included abstaining from sexual intercourse until marriage," and betraying her boyfriend by "having 'hookups' with [Plaintiff]." (*Id.*). RP also knew and felt guilty about the fact that Plaintiff was in a relationship with another woman. (*Id.*).

Whereas previously, RP had initially "insisted that ***nothing*** was consensual during the [November 13th] encounter" with Plaintiff, she now "acknowledged kissing [Plaintiff] back." (*Id.* ¶¶ 110, 194). Moreover, "although she first insisted" to Murphy that "'fingering' and a 'hand job' was as far as things had ever gone during any of their sexual encounters," RP later "admitted to a pregnancy scare over their second [October 24th] encounter" because they "had attempted vaginal intercourse" but that "her inexperience made penetration difficult." (*Id.*). Despite having previously told Murphy, as well as Jackson that "the[] previous [October 11th and 24th] instances had been consensual," RP now "insisted that the previous attempt at a vaginal intercourse had been ***non-consensual***." (*Id.* ¶¶ 110–11, 194).

Regarding "their third sexual encounter, RP "avoided mention of mutual oral sex." (*Id.* ¶ 112) She "described her participation in their sex as passive: She 'ended up with her clothes off' and 'ended up on top of Plaintiff . . . [and] remained on top of him for a few minutes.'" (*Id.*). At the conclusion of this interview, RP stated that "she did not want to see" Plaintiff prosecuted, punished, or investigated further. (*Id.* ¶ 115). On December 9th, the SPD "completed a detailed interview with [Plaintiff] as part of its investigation." (*Id.* ¶ 116). The SPD subsequently "closed any and all criminal investigation." (*Id.* ¶ 117).

### C.      The Public and Governmental Pressure on Syracuse University

At the "precise time of RP and [Plaintiff's] sexual encounters, Syracuse faced substantial criticism" from sources, including "its student body, the media, and [the] federal and state government" for allegedly looking the other way when female students complained of sexual assault as well as not actively prosecuting alleged male perpetrators." (*Id.* ¶¶ 51, 191).

Colleges and universities, including Syracuse, "feared being investigated or sanctioned by the Department of Education's Office for Civil Rights ("OCR") for violating Title IX." (*Id.* ¶ 52). Protests broke out at universities, including Syracuse. (*Id.* ¶¶ 57, 67–68, 75). Universities also "feared lawsuits brought by alleged female victims of sexual assault" as well as "complaints to the OCR and [the] Department of Justice." (*Id.* ¶ 52).

Defendants "strove to demonstrate that Syracuse would do anything to support female students who alleged sexual assault." (*Id.* ¶ 65). In the case of RP and other women who came forward "in the 2016/2017 timeframe, Syracuse's willingness to accept uncritically female accusations of sexual assault reached a zenith" and Syracuse was "eager and overly enthusiastic to demonstrate to the student body and the public that it was serious about quashing a supposed male 'rape culture' on campus." (*Id.* ¶ 66). Syracuse "took active steps to increase the number of Title IX cases against male students" and "presumed male students responsible for sexual assault by virtue of archaic assumptions about male sexual desire." (*Id.* ¶ 192). Simultaneously, "in violation of its own policies, Syracuse relaxed the standards of evidence for alleged female victims," applied "lax investigatory techniques to accusing students," and "increased the sanctions imposed on male students accused of sexual assault." (*Id.*).

OCR attorneys scheduled a visit to Syracuse on January 24, 2017, in response to a "complaint alleging that Syracuse was not acting promptly enough when it received notice of female students' allegations of sexual assault." (*Id.* ¶¶ 70–71). To appease OCR, Syracuse

administrators emphasized that "[c]ampus officials said they have taken 'significant steps' in recent years to prevent sexual and relationship violence." (*Id.* ¶ 72). Syracuse's Title IX Office "instituted gender biased policies and procedures due to the atmosphere of student protests, media attention, and governmental pressure." (*Id.* ¶ 75). Syracuse "appointed administrators and staff who furthered this bias," which "manifested" in the course of Plaintiff's case. (*Id.*).

### D. Syracuse's Title IX Proceedings Against Plaintiff

#### 1. Syracuse Initiates a Title IX Complaint Against Plaintiff

On January 25, 2017, the day after OCR came to campus, "Syracuse initiated its Title IX Complaint against [Plaintiff]." (*Id.* ¶¶ 146–47). The complaint was brought by Syracuse, not RP. (*Id.* at 2 n.1). Plaintiff alleges that Syracuse initiated this complaint, over two months after the report by RP, and over a month after the SPD had closed its investigation "in response to public and governmental pressure to extirpate the so-called 'rape culture' among Syracuse male students." (*Id.* ¶ 74).

#### 2. Trauma-informed Victim Interview Techniques

The Title IX investigator in Plaintiff's case, Defendant Bernerd Jacobson, has a "background in victim advocacy, in which he championed the victim's voice." (*Id.* ¶ 85). Jacobson uses "'trauma-informed' [victim] interview techniques" ("TIVITs") that privilege alleged victims' accounts over those of the accused male students. (*Id.* ¶¶ 86–87). Jacobson and others "viewed their job as to support the perceived vulnerability of women to Syracuse 'rape culture.'" (*Id.* ¶ 218).

Syracuse teaches its Title IX investigators TIVITs and does so in an "amateur and unprofessional manner to individuals with no proper education." (*Id.* ¶¶ 90–91). TIVITs "hold that victims' memories are fragmented and prone to expressions of feelings or sensations rather than the precise recall of events." (*Id.* ¶ 88). Under TIVITs, perpetrators of sexual assault "are

supposedly rational actors" who "plan[], practic[e], and becom[e] habitual rapists and sexual predators." (*Id.*). "Inconsistency in the alleged female victim's account thereby becomes evidence that her testimony is truthful, because of alleged trauma." (*Id.* ¶ 89). Conversely, the accused's consistent story becomes "evidence that he is a premeditated and experienced sex offender." (*Id.*). Syracuse implements TIVITs despite "the lack of solid scientific support in assessing" victim testimony. (*Id.* ¶ 93).

These techniques were applied to Plaintiff and RP "at every stage in the investigation." (*Id.* ¶¶ 90, 96, 193). TIVITs were "applied to RP despite the absence of any clinical determination of whether, in fact, RP suffered trauma." (*Id.* ¶ 96). RP never sought trauma treatment at a hospital. (*Id.*). Syracuse applies TIVITs with "bias against male students," (*id.* ¶ 97), and to "enhance the credibility and lower the standards of evidence in order to find alleged female victims 'credible.'" (*Id.* ¶ 219).

### 3.    Jacobson's Report

Jacobson interviewed RP on January 25, 2017, the same day Syracuse initiated the Title IX complaint." (*Id.* ¶¶ 118–19). He interviewed RP again on April 3, 2017. (*Id.* ¶ 119). With Jacobson, "RP reverted to her account that the two sexual 'hookups' in October had been entirely consensual and dropped her allegation of any sexual assault before November 13, 2016. (*Id.*). When discussing her third encounter with Plaintiff, "RP reverted to insisting that ***nothing was consensual*** and that 'she didn't do anything that he could have interpreted as 'yes.'' (*Id.* ¶ 120). For the first time, RP "averred that she 'was in shock.'" (*Id.* ¶¶ 120, 193–94).

Jacobson completed the Investigation Report ("Jacobson Report") on April 17, 2017. (*Id.* ¶ 163). The Jacobson Report summarizes Jacobson's two interviews with RP as well as "the statement that [Plaintiff] made to Detective James Hill of the Syracuse DPS." (*Id.* ¶¶ 150, 195). Jacobson also appended SPD reports of interviews with Plaintiff and RP. (*Id.* ¶ 150).

Jacobson failed to scrutinize evidence weighing on RP's credibility, including "contradictions between various statements" and the destruction of text messages. (*Id.*). In "an affirmative credibility assessment," Jacobson concluded, RP is "credible and the information she provides is reliable.'" (*Id.* ¶¶ 155–56, 194). "Jacobson disregarded and gave no account of inconsistencies in RP's statements, in particular RP's vacillation about sexual contact on November 13, 2016 to which she had consented after claiming that no sexual contact had been consensual on that day." (*Id.* ¶ 157). Jacobson "also gave no account of RP's vacillation about attempted vaginal sex prior to November 13, 2016, in which she had accused [Plaintiff] of another sexual assault to SPD officer Murphy, contradicting clear statements that the prior two sexual encounters had been consensual." (*Id.*). Jacobson then gave "only cursory treatment" to Plaintiff's "consistent accounts," (*id.* ¶¶ 158, 196, 211), but noted that Plaintiff's "description of events was "also entirely plausible." (*Id.* ¶ 158).

Jacobson released his report on April 17, 2017, "82 days from the date of the Syracuse Complaint and a full six months from the time the matter was first reported to Syracuse." (*Id.* ¶ 163).[3] Plaintiff's hearing "was not scheduled until May 5, 2017, the first day of [Plaintiff's] finals week." (*Id.* ¶ 165).

### 4.    Notice of Formal Charges[4]

`       On April 28, 2017, Plaintiff received notice of the formal charges:

> 1)   Physical harm or threat of physical harm to any person or persons, including but not limited to: assault, sexual abuse, or other forms of physical abuse.

---

[3] The Jacobson Report, released on April 17, 2017, was "timed within the closing weeks of the spring semester" when Plaintiff was only "one course short of graduation with his Masters degree." (Dkt. No. 1, ¶ 164).

[4] Plaintiff alleges that he has never received a copy of the complaint against him. (*Id.* ¶ 134). Plaintiff only learned of the complaint "through a single reference in the final investigation report, which merely listed the date Syracuse originated the complaint." (*Id.*). He alleges that he only learned of "the specific allegations" against him "at the end, rather than at the outset of" the investigation, in the Jacobson Report. (*Id.* ¶ 230(d)).

3)  Conduct—whether physical, verbal or electronic, oral, written or video—which threatens the mental health, physical health, or safety of any person or persons including, but not limited to hazing, drug or alcohol abuse, bullying or other forms of destructive behavior.

15) Violation of University policies, rules or regulations that are published in the Student Handbook, or other official University publications or agreements.

   • Syracuse University Policy on Sexual Assault, Sexual Harassment, Stalking or Relationship Violence.

(*Id.* ¶ 166).

### 5.    The University Conduct Board Hearing (the "Hearing")

The Hearing took place on May 5, 2017 before "a panel of three career administrators" (collectively the "Board"). (*Id.* ¶ 168). Both RP and Plaintiff testified. (Dkt. No. 20-2, at 46). Syracuse, however, did not permit Plaintiff to hear what RP said. (Dkt. No. 1, ¶ 181). The Board concluded that Plaintiff performed cunnilingus on RP; that Plaintiff had RP perform fellatio on him; that the parties engaged in sexual touching; and that Plaintiff had vaginal intercourse with RP, all without RP's affirmative consent. (Dkt. No. 20-2, at 44). The Board followed Jacobson's findings "and found RP credible." (*Id.*; Dkt. No. 1, ¶ 169). The Board specifically cited to RP's "consistency with her recollection of events," without addressing the fact that its findings—that RP and Plaintiff had "two previous incidents of consensual sexual contact" and that RP consented to kissing in the bedroom on November 13, 2016—were inconsistent with previous statements by RP. (Dkt. No. 20-2, at 43–44).

The Board found that RP "withdrew consent" when the parties were kissing in the bedroom, and that Plaintiff then then "stopped the interaction." (Dkt. No. 1, ¶ 172; Dkt. No. 20-2 at 43). The Board found that Plaintiff wanted to continue the sexual activity and kissed RP without consent. (Dkt. No. 20-2, at 43). After that point, the Board "considered consent permanently and irrevocably withdrawn—without, however, making any findings as to how

[Plaintiff] somehow forced RP to position herself on top of him or forced, physically, emotionally, or otherwise, her mouth onto his penis." (Dkt. No. 1, ¶ 172).

While the Board found RP "credible," it concluded that Plaintiff was only "partially credible," citing to his admission that he 1) had sexual desire for RP, and 2) was 'horny' after RP withdrew consent for kissing. (*Id.* ¶ 173; Dkt. No. 20-2, at 44). Plaintiff alleges that applying "archaic stereotypes of male sexual desire, the Board took [Plaintiff's] admission of being 'horny' as evidence that he could not credibly deny sexually assaulting RP." (Dkt. No. 1, ¶¶ 174, 190, 211). The Board also found that Plaintiff "premeditated these actions and had intent to engage in sexual contact and intercourse with [RP] from the moment he saw her at church" because by Plaintiff's "own admission, when he saw [RP] at church, he knew he wanted to have sexual relations with her and knew that such acts would occur." (*Id.* ¶ 174; Dkt. No. 20-2, at 46). Plaintiff alleges that these findings "conformed to the stereotype and archaic assumption that Syracuse was beset by a male 'rape culture' driven by uncontrollable male sexual desire, while female students are its passive victims and targets." (Dkt. No. 1, ¶¶ 175, 190). Plaintiff alleges that the Board did not question RP about her sexual desire for Plaintiff. (*Id.* ¶¶ 175, 211(g)).

Plaintiff alleges that the Board "also held it against [Plaintiff] that" the sexual encounter "had started, stopped, and began again." (*Id.* ¶ 177). According to Plaintiff "[u]ndisputed evidence" that Plaintiff "had done the right thing by ceasing sexual contact where RP said, 'no' was . . . another piece of evidence Syracuse turned on its head" and "held this to be evidence that no further affirmative consent was possible." (*Id.* ¶¶ 177, 40).

RP alleged for the first time at the hearing, and the Board credited the allegation, that she was "fearful of leaving" Plaintiff's apartment "prior to sexual contact." (*Id.* ¶ 178). The Board "thus disregarded RP's previous statement that she was not fearful or upset" by Plaintiff. (*Id.* ¶¶

96, 178; Dkt. No. 20-2, at 44, 47). The Board concluded that the incident "caused [RP] significant trauma and is affecting her mental well-being." (Dkt. No. 1, ¶ 178; Dkt. No. 20-2, at 47). By contrast, "the Board ignored undisputed evidence of [Plaintiff's] mental anguish and trauma, which had caused him to call a counseling hotline twice." (Dkt. No. 1, ¶¶ 178, 198; Dkt. No. 20-2, at 14). Plaintiff alleges that "'[t]rauma' averred by the alleged female victim was enough to justify contradictions in [RP's] story." (Dkt. No. 1, ¶ 179). "Undisputed trauma of the male student, however, did not make his consistent story credible to the Board." (*Id.*). The Board did not explain its "contradictory findings." (*Id.* ¶ 180). Plaintiff alleges that Syracuse failed to apply a "preponderance standard" to Plaintiff's case, as required by its policies, and that if it had applied the correct standard "a finding of 'not responsible' would have been the only conceivable outcome." (*Id.* ¶¶ 230, 247).[5]

Plaintiff further alleges that the delay in his case—which spanned 107 days from the January 25th initiation of the Title IX complaint until the Board's May 11th decision—violated Syracuse's policy that the process would be completed within 60 days. As a result, Plaintiff needlessly spent additional time, effort, and tuition for Spring Semester to complete his Masters Program. (*Id.* ¶ 165). Plaintiff alleges that he "never received any written explanation or notice for Syracuse's delay, contrary to and in violation of [the Handbook]." (*Id.* ¶¶ 164, 229, 237).

### E.    Plaintiff's Expulsion from Syracuse University

At time of Syracuse's final decision to expel Plaintiff, he had "only one more remaining class and was only awaiting his research results to finish his last degree requirements." (*Id.* ¶ 22). Plaintiff "received recommendations from staff and professors" when Syracuse expelled him in

---

[5] On May 16, 2017, Plaintiff appealed the Board's decision. (*Id.* ¶ 184). The Syracuse "appeals panel" affirmed the Board's decision. (*Id.* ¶ 185; Dkt. No. 20-2, at 50).

Spring 2017 but "was forever barred from completing his degree." (*Id.*). Plaintiff has been "unable to complete his Masters degree," (*id.* ¶¶ 186, 202), and has a "permanent mark on his transcript indicating a conduct code violation, which he must disclose to any future university or employer to which he applies." (*Id.* ¶ 186). Plaintiff has been "unable to enroll" in a new university to pursue graduate studies. (*Id.* ¶ 187). Without "correcting and expunging his transcript," Plaintiff's "career will suffer permanent damage" and his "professional future has been permanently blighted." (*Id.*). By "erroneously labeling him a sex offender," Syracuse has "blocked [Plaintiff's] career path in forensic science." (*Id.*). Plaintiff has "forfeited tuition and fees," (*id.* ¶¶ 202, 214, 225), and suffered emotional distress, psychological damage, loss of income, reputational damage, and diminished career opportunities. (*Id.* ¶¶ 202, 214, 225).

## III.   LEGAL STANDARD

To survive a motion to dismiss under Rule 12(b)(6) for failure to state a claim, "a complaint must provide 'enough facts to state a claim to relief that is plausible on its face.'" *Mayor & City Council of Balt. v. Citigroup, Inc.*, 709 F.3d 129, 135 (2d Cir. 2013) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). The plaintiff must provide factual allegations sufficient "to raise a right to relief above the speculative level." *Id.* (quoting *Twombly*, 550 U.S. at 555). The court must accept as true all factual allegations in the complaint and draw all reasonable inferences in the plaintiff's favor. *See EEOC v. Port Auth.*, 768 F.3d 247, 253 (2d Cir. 2014) (citing *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007)). However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). When deciding a motion to dismiss, the Court's review is ordinarily limited to "the facts as asserted within the four corners of the complaint, the documents attached to the complaint as

exhibits, and any documents incorporated in the complaint by reference." *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 191 (2d Cir. 2007).

## IV.   DISCUSSION

### A.   Documents Extraneous to the Complaint

Defendants attach a number of exhibits in support of their motion. (*See* Dkt. Nos. 20-1–20-4). Thus, as a preliminary matter, the Court must decide which, if any, to consider in resolving this motion. Defendants argue the Court may "review documents integral to the complaint upon which the plaintiff relied in drafting his pleadings, as well as any documents attached to the complaint as exhibits and any statements or documents incorporated into the complaint by reference." (Dkt. No. 20-6, at 11) (internal quotation marks omitted). Plaintiff argues that the Court should not consider this evidence because (1) doing so contravenes the general rule when adjudicating a motion to dismiss under Fed. R. Civ. P. 12(b)(6); (2) Defendants "mischaracterize[e] . . . these documents"; and (3) Defendants previously "withheld the extraneous documents on which they now rely" from Plaintiff's educational file. (Dkt. No. 27, at 11–13).

"Generally, consideration of a motion to dismiss under Rule 12(b)(6) is limited to consideration of the complaint itself." *Faulkner v. Beer*, 463 F.3d 130, 134 (2d Cir. 2006). However, considering "materials outside the complaint is not entirely foreclosed on a 12(b)(6) motion." *Id.* A complaint "is deemed to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference." *Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 230 (2d Cir. 2016) (quoting *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002)). "Where a document is not incorporated by reference, the court may nevertheless consider it where the complaint relies heavily upon its terms and effect, thereby rendering the document integral to the complaint." *Id.* (quoting *DiFolco v. MSNBC Cable L.L.C.*,

622 F.3d 104, 111 (2d Cir. 2010) (internal quotation marks omitted)). Even where a document is

deemed "'integral' to the complaint, it must be clear on the record that no dispute exists

regarding the authenticity or accuracy of the document." *Id.* (quoting *DiFolco*, 622 F.3d at 111).

"It must also be clear that there exist no material disputed issues of fact regarding the relevance

of the document." *Id.* (quoting *Faulkner*, 463 F.3d at 134). "This principle is driven by a concern

that a plaintiff may lack notice that the material will be considered to resolve factual matters." *Id.*

Thus, "if material is not integral to or otherwise incorporated in the complaint, it may not be

considered unless the motion to dismiss is converted to a motion for summary judgment and all

parties are 'given a reasonable opportunity to present all the material that is pertinent to the

motion.'" *Id.* (quoting Fed. R. Civ. P. 12(d)). As set forth below, the Court finds that some, but

not all of the documents submitted by Defendants may be considered.

### 1.    The 2016-17 Handbook

The Complaint relies on, and includes a URL that navigates to, a version of the Syracuse

Handbook entitled "Student Conduct System Handbook 2017–18." [6] (Dkt. No. 1, ¶ 122).

Asserting that 2017–18 Handbook was not "in effect during the relevant 2016–17 school year,

Defendants attach the 2016–17 Handbook as an exhibit to their motion. (Dkt. No. 20-2, at 51-89;

Dkt. No. 20-6, at 16 n.2; Dkt. No. 28, at 4 n.2). Plaintiff responds that "Defendants have

improperly introduced the [2016–17] Handbook into the record on their Rule 12(b)(6) motion.

(Dkt. No. 27, at 13 n.3).

---

[6] The Court cites to the Handbook by Part number or, where necessary, page number. Syracuse University, *Student Conduct System Handbook: 2017-2018*, http://studentconduct.syr.edu/_documents/StudentConductSystemHandbook2017-2018.pdf (last visited Feb. 21, 2020).

The Court declines to consider the 2016-17 Handbook attached to Defendants' motion because a "disputed issue[] of fact regarding the relevance of the document" underlies Defendants' argument. *See Nicosia*, 834 F.3d at 231 (quoting *Faulkner*, 463 F.3d at 134). That is, the parties do not appear to agree which contractual terms were in force at the time of the relevant events. *Id.* at 231 ("If . . . there is a dispute as to the relevance, authenticity, or accuracy of the documents relied upon, the district court may not dismiss the complaint with those materials in mind.").

### 2.   Documents Referred to and Relied Upon in the Complaint

Defendants have attached (1) the Jacobson Report, (2) the Board's Opinion, (3) the Appeal Panel's Opinion, and (4) a December 1, 2016 email from Eric Nestor to Plaintiff to their motion, arguing that the Court may consider these exhibits because Plaintiff "relies upon and references" them. (Dkt. No. 20-6, at 12; Dkt. No. 20-2, at 1-50, 90-91). The Court agrees. Throughout his Complaint, Plaintiff repeatedly refers to these documents and sometimes summarizes their contents. (*E.g.*, Dkt. No. 1, ¶¶ 75, 95, 98, 144, 150–51, 153–62, 169–80, 182, 185, 194, 211). Moreover, the Complaint "relies heavily upon [their] terms and effect, thereby rendering the document[s] integral to the complaint." *Nicosia*, 834 F.3d at 230 (quoting *DiFolco*, 622 F.3d at 111). Since Plaintiff "obviously possessed them and relied on them in drafting" the Complaint, the Court will consider them. *Routh v. Univ. of Rochester*, 981 F. Supp. 2d 184, 191 (W.D.N.Y. 2013)

### 3.   Additional Emails Attached to the Complaint

Defendants attach additional emails to their motion: emails exchanged between Tekhara Watson and Jacobson, (Dkt. No. 20-4, at 1–3); a February 9, 2017 emailed letter from Jacobson to Plaintiff, (*id.* at 4); emails exchanged between Jacobson and Plaintiff, (*id.* at 5–6); and an April 14, 2017 email from Defendant Sheila Johnson-Willis to Plaintiff. (*Id.* at 7). However,

because the emails were "'not attached to the complaint, w[ere] not incorporated by reference in the complaint,' and therefore 'w[ere] not integral to the complaint,' it is improper to consider [them] when considering a motion to dismiss." *Jones v. Halstead Mgmt. Co., LLC*, 81 F. Supp. 3d 324, 332 (S.D.N.Y. 2015) (quoting *DiFolco*, 622 F.3d at 113). Accordingly, the Court declines to consider them.[7]

### B.     Title IX (First, Second, and Third Claims Against Syracuse Defendants)

The Syracuse Defendants move to dismiss Plaintiff's Title IX claims as applied to Defendant Board of Trustees. (Dkt. No. 20-6, at 12–13). The Syracuse Defendants argue that the claim should be dismissed because "Plaintiff fails to allege that the Board of Trustees is an 'educational entity' that receives federal funds" as required to establish liability under Title IX." (*Id.* at 13). In response, "Plaintiff withdraws Count 1-3 against the Board." (Dkt. No. 27, at 30). Accordingly, the Syracuse Defendants' motion to dismiss Plaintiff's Title IX claims as to the Board of Trustees is granted.

### C.     Breach of Contract (Fourth Claim Against Syracuse Defendants)

Plaintiff's fourth cause of action alleges breach of contract under New York law against Syracuse. (Dkt. No. 1, ¶¶ 227–32). The Syracuse Defendants argue that Plaintiff's breach of contract claim should be dismissed, arguing that Plaintiff alleges "the sorts of non-actionable statements of general policy that courts applying New York law cannot support a breach of contract claim." (Dkt. No. 20-6, at 14). Plaintiff responds that his contract claims are "rooted in specific promises set forth in Syracuse policies." (Dkt. No. 27, at 20).

---

[7] The Court finds documents Plaintiff has hyperlinked in the Complaint to be "referenced" therein and will consider them in deciding this motion. *Estate of Roman v. City of Newark*, 914 F.3d 789, 796, 799 (3d Cir. 2019) (considering documents hyperlinked in the Complaint), *cert. denied*, 140 S. Ct. 82 (2019), *and cert. denied*, 140 S. Ct. 97 (2019).

To survive a motion to dismiss for a breach of contract claim under New York law,  the complaint must allege facts which show: "(1) the existence of an agreement, (2) adequate performance of the contract by the plaintiff, (3) breach of the contract by the defendant, and (4) damages." *Habitzreuther v. Cornell Univ.*, No. 14-cv-1229, 2015 WL 5023719, at *5, 2015 U.S. Dist. LEXIS 112209, at *14 (N.D.N.Y. Aug. 25, 2015) (quoting *Eternity Glob. Master Fund Ltd. v. Morgan Guar. Trust Co. of N.Y.*, 375 F.3d 168, 177 (2d Cir. 2004)).

Under New York law, "an implied contract is formed when a university accepts a student for enrollment: if the student complies with the terms prescribed by the university and completes the required courses, the university must award him a degree." *Papelino v. Albany Coll. of Pharmacy of Union Univ.*, 633 F.3d 81, 93 (2d Cir. 2011) (citing *Carr v. St. John's Univ.*, 17 A.D.2d 632, 633 (2d Dep't), *aff'd*, 12 N.Y.2d 802 (1962)). The terms of the implied contract are "contained in the university's bulletins, circulars and regulations made available to the student." *Id.* (quoting *Vought v. Teachers Coll., Columbia Univ.*, 127 A.D.2d 654, 654 (2d Dep't 1987)). "Implicit in the contract is the requirement that the institution 'act in good faith in its dealing with its students.'" *Id.* (quoting *Olsson v. Bd. of Higher Educ.*, 49 N.Y.2d 408, 413–14 (1980)). At the same time, "the student must fulfill [his] end of the bargain by satisfying the university's academic requirements and complying with its procedures." *Id.* (quoting *Gally v. Columbia Univ.*, 22 F. Supp. 2d 199, 206 (S.D.N.Y. 1998)). To "state a claim for breach of such a contract, a student must identify 'specifically designated and discrete promises.'" *Nungesser v. Columbia Univ.*, 169 F. Supp. 3d 353, 370 (S.D.N.Y. 2016) (quoting *Ward v. New York Univ.*, No. 99-cv-8733, 2000 WL 1448641, at *4, 2000 U.S. Dist. LEXIS 14067, at *11 (S.D.N.Y. Sept. 28, 2000)). "'General policy statements' and 'broad and unspecified procedures and guidelines' will not suffice." *Id.* (quoting *Ward*, 2000 WL 1448641, at *4, 2000 U.S. Dist. LEXIS 14067, at

*10); *see also Gally*, 22 F. Supp. 2d at 208 ("[G]eneral promises about ethical standards" that are

"subject to neither quantification nor objective evaluation" "are far different from the types of

specific promises which have led to valid breach of contract claims against universities.").

### 1.      Syracuse's Policies

Syracuse has promulgated policies to address sexual misconduct as well as other student

conduct code violations, including its Title IX Policy and the Student Conduct System Handbook

("the Handbook") to comply with Title IX's requirements as well as other applicable laws. (*Id.*

¶¶ 122, 126).

### 2.      The November 2016 No Contact Order

The Handbook Provides that if a No Contact Order "is issued, both parties will receive a

written copy of the Order and both parties are expected not to have contact with one another.

(Handbook, Part 4.7). It further provides that No Contact Orders "will be reviewed by the

Director of the Office of Student Rights and Responsibilities, or a designee, within two business

day of its issuance. The Director, or designee, will determine if there is a need to continue the

order, amend the order, or remove the order. Both parties will be notified in writing of the

decision of the Director, or the designee." (*Id.* at 4.8).

Plaintiff alleges that the Syracuse Defendants breached Part 4.7 by (i) failing to notify

him that a No Contact Order had been issued or provide a copy until weeks later and (ii) "by

failing to issue a symmetrical [No Contact Order] instructing RP to stay away from" Plaintiff.

(*See* Dkt. No. 1, ¶¶ 135–40). The Syracuse Defendants acknowledge that a temporary No

Contact Order was issued on November 15, 2016, when RP first reported the allegation, but note

that Plaintiff receive notice of the order via Nestor's December 1, 2016 email.[8] (Dkt. No. 20-6, at 15).

Plaintiff has plausibly alleged that Syracuse breached the policy provision that "both parties will receive a written copy" of a No Contact Order with respect to the Order issued on November 15, 2016. (Dkt. No. 1, ¶¶ 137, 144). RP had been notified by November 27th when Plaintiff left her a voicemail. (*Id.* ¶¶ 142–43). Furthermore, as Plaintiff alleges, the delay in notifying him about the No Contact Order caused him to unknowingly violate it. (*Id.* ¶¶ 141–43). Because Plaintiff had not been notified, he could not have known that he was "expected not to have contact" with RP when he left her a voicemail. (Handbook, Part 4.7).

Handbook Part 4.7, moreover, "cannot be characterized as generalized 'policy statements' or 'unspecified procedures.'" *Doe v. Syracuse Univ. ("Doe 2019")*, No. 18-cv-377, 2019 WL 2021026, at *11, 2019 U.S. Dist. LEXIS 77580, at *31 (N.D.N.Y. May 8, 2019). (Dkt. No. 20-2, at 2; Dkt. No. 20-6, at 15). Accordingly, drawing all inferences in Plaintiff's favor, Plaintiff has plausibly alleged that the Syracuse Defendants breached the No Contact Order policy.

### 3.    Notice and a Fair Proceeding

A "Statement of Student Rights and Responsibilities" in the Handbook provides that "students have the right to fundamental fairness before formal disciplinary sanctions are imposed by the University for violations of the Code of Student Conduct." (Handbook, at 2). This

---

[8] The Syracuse Defendants further argue that Nestor did not send notice earlier because he had not been advised of the No Contact Order, and that Plaintiff was not provided with the Order earlier "because SPD specifically directed DPS not to do so during the pendency of its investigation." (Dkt. No. 20-6, at 15 (emphasis omitted). According to the Complaint, however, the SPD investigation was still proceeding on December 1, 2016, when Nestor did notify Plaintiff of the Order. (*See* Dkt. No. 1, ¶¶ 116–17 (describing SPD interview of Plaintiff on December 9, 2016 and subsequent termination of SPD investigation)). At this stage of the proceedings, where the Court must assume the truth of the well-pled facts in the Complaint, the Court declines to consider these arguments further.

provision further states that "[s]tudents have the right to written notice and the opportunity for a hearing before any change in status is incurred for disciplinary reasons unless a significant threat to persons or property exists." (*Id.*). A Bill of Rights in the Handbook states that "[a]ll students have the right to . . . [p]articipate in a process that is fair, impartial, and provides adequate notice and meaningful opportunity to be heard." (*Id.* at 4). The Handbook further provides that "[t]he complainant and respondent will be notified simultaneously in writing of the charges filed against the respondent." (*Id.* at Part 10.15).[9]

Plaintiff alleges that Syracuse "fail[ed] to provide [Plaintiff] with written notice of the charges against him" in violation of these provisions. (Dkt. No. 27, at 21).[10] Plaintiff alleges that "to this day [he] has not received a copy of the complaint against him" and that he "only learned of the formal charges on April 28, 2017." (Dkt. No. 1, ¶¶ 132, 166). The Syracuse Defendants argue that promises "that students [are entitled to] receive 'written notice' or 'adequate notice' are 'the sorts of non-actionable statements of general policy that courts applying New York law have held cannot support a breach of contract claim." (Dkt. No. 20-6, at 16 (citing, inter alia, *Doe v. Syracuse Univ. ("Doe 2018")*, 341 F. Supp. 3d 125, 141 (N.D.N.Y. 2018)). The Syracuse Defendants also argue that "the University in fact provided Plaintiff with adequate and sufficient notice as set forth in the Handbook" because the "Bill of Rights and Statement of Student Rights

---

[9] While the Syracuse Defendants assert that this policy provision was not yet in effect, the Court cannot resolve that issue at this stage of the proceedings.

[10] Plaintiff also cites to Syracuse's obligation to establish procedures for "a prompt, fair and impartial" proceeding, quoting 34 C.F.R. § 668.46(k)(3)(i)(B)(2-3), a regulation enacted under the Clery Act. (Dkt. No 27 at 21 & n.6; *Id.* ¶ 133). *See Z.J. v. Vanderbilt University*, 355 F. Supp. 3d 646, 706 n.48 (M.D. Tenn. 2018). Plaintiff does not have a cause of action under this regulation: the Clery Act "specifically states that its provisions do not give rise to private causes of action against educational institutions." 20 U.S.C. §§ 1092(f)(14)(A)(i); 1092(i)(5)(C); 1092(j)(2)(B). *Beck v. Cornell Univ.*, No. 16-cv-1104, 2016 WL 6208535, at *2, 2016 U.S. Dist. LEXIS 130554, at *4–5 (N.D.N.Y. Sept. 22, 2016) (citing *Dziedzic v. State Univ. of New York at Oswego*, Case No. 10-cv-1018, 2014 WL 7331926, at *2), *report and recommendation adopted*, 2016 WL 6208542, 2014 U.S. Dist. LEXIS 175343 (N.D.N.Y. Oct. 24, 2016)). The obligations imposed by the Clery Act are enforced by the Department of Education. *Doe v. United States Dep't of Health and Human Servs.*, 85 F. Supp. 3d 1, 4 (D.D.C. 2015).

and Responsibilities do not provide any specific timetable for when notice must be provided."
(*Id.*).

The Court agrees with the Syracuse Defendants in part. The Bill of Rights, which provides for the right to "adequate notice" is not a specific contractual promise that could be the basis of a viable breach of contract claim, *see*, *e.g.*, *Noakes v. Syracuse Univ.*, 369 F. Supp. 3d 397, 420 (N.D.N.Y. 2019); *Doe 2018*, 341 F. Supp. 3d 125 at 141. And to the extent that Plaintiff is relying on a right to "written notice," the April 17, 2017 Jacobson Report, which Plaintiff acknowledged having received, and which does list three code of student conduct violations and the "conduct alleged," was written notice. (Dkt. No. 1, ¶ 210(a)).

However, to the extent Plaintiff is relying on the provision stating that a student will be notified "in writing of the charges *filed* against the respondent," that provision is specific and concrete, and Plaintiff has plausibly alleged that it was breached. (Handbook, Part 10.15) (emphasis added). Plaintiff asserts that Syracuse violated this provision because he "was never notified, and still to this day has not received the complaint against him." (Dkt. No. 27, at 22; Dkt. No. 1, ¶ 132). The Syracuse Defendants cite to the Jacobson Report, (Dkt. No. 20-2, at 1–2), which refers to the "[f]ormal complaint reported January 25, 2017"; but the Jacobson Report does not contain any information about that complaint or the conduct charged in that complaint. (Dkt. No. 20-2 at 1). The Syracuse Defendants also cite to Plaintiff's allegation that he received notice, on April 28, 2017, of the "formal charges brought by Syracuse." (Dkt. No. 1, ¶ 166). The record does not reflect how Plaintiff received this notice.. Thus, construing the allegations in the light most favorable to Plaintiff, he has plausibly alleged that he did not receive notice "in writing of the charges filed against [him]." (Handbook, Part 10.15).

Finally, the fairness provisions in the Bill of Rights and the Statement of Student Rights and Responsibilities are insufficient to state a breach of contract claim. (*See* Handbook, at 4 (affording students the right to "[p]articipate in a process that is fair, impartial, and provides adequate notice and meaningful opportunity to be heard"); Handbook, at 2 ("Students have the right to fundamental fairness before formal disciplinary sanctions are imposed by the University for violations of the Code of Student Conduct")). "Provisions that students will be treated in a 'fundamentally fair' manner, or in a manner that is consistent with fundamental 'student rights,' are the sorts of non-actionable statements of general policy that courts applying New York law have held cannot support a breach of contract claim." *Doe 2018*, 341 F. Supp. 3d at 141; *see also Noakes*, 369 F. Supp. 3d at 419. Accordingly, the Syracuse Defendants' partial motion to dismiss Plaintiff's breach of contract claim is granted as to the failure to provide a fair proceeding.

### 4.      Delay in the Process

The Handbook provides that "[t]he process of investigation and the Board's decision will be concluded within 60 days of the original complaint, pending special circumstances." (Handbook, Part 10.21). It further provides that "[i]f circumstances arise that delays either the investigation or the Board's determination of an outcome, both parties will be sent written notification of the delay and its cause." (*Id.*; *see also* Title IX Policy G(j)).  Plaintiff alleges that there were no special circumstances warranting the delay in his case—which spanned 107 days from the January 25th initiation of the Title IX complaint until the Board's May 11th decision. (Dkt. No. 1, ¶¶ 131, 162, 230(c)). Plaintiff alleges that he never received any written explanation or notice for this delay. (*Id.* ¶ 164).[11] Plaintiff further alleges that he "spent additional tuition for

---

[11] The Syracuse Defendants dispute Plaintiff's allegation of that he was not informed of any special circumstances. (Dkt. No. 20-6, at 18). In doing so, however, they cite an email outside the record of what the Court can consider on this motion to dismiss. (*Id.*; Dkt. No. 28, at 8–9).

Spring Semester [and] valuable time and effort to complete his Masters Program – all for naught." (*Id.* ¶ 165).

The Handbook's 60-day provision is not a generalized "policy statement" or "unspecified procedure," *Doe 2019*, 2019 WL 2021026, at *11, 2019 U.S. Dist. LEXIS 77580, at *31. Thus, Plaintiff has plausibly alleged that the Syracuse Defendants breached Part 10.21 of the Handbook by its delay in the process.

### 5.      Application of the Preponderance of Evidence Standard

Plaintiff alleges that Syracuse failed to "apply the preponderance of evidence" as set forth in the Handbook and the Title IX policies. (Dkt. No. 1, ¶ 230(e)). Defendants argue that Plaintiff fails to "identify a specific promise or obligation that was breached by the University," and, in any event, it "is clearly applied" by the Board in its decision. (Dkt. No. 20-6, at 19).

The Handbook provides, in relevant part, at Part 10.17: that "the Board will determine whether it is more likely than not that the respondent violated the Code of Student Conduct using the preponderance of the evidence standard."[12] Syracuse's Title IX policy provides, in relevant part: "In determining whether sex discrimination, sexual harassment or sexual misconduct occurred, the University . . . uses a 'preponderance of the evidence' standard," which means "evidence which is of greater weight or is more convincing than opposing evidence such that it is 'more likely than not' than an act occurred."(*See* Dkt. No. 1, ¶¶ 122, 130; Title IX Policy, § V.G.g). As described in the Handbook, preponderance of the evidence "requires a demonstration that it is 'more likely than not' that the respondent . . . has violated the Code of Student Conduct." (Handbook, Part 5.3).

---

[12] Under the policy, "respondent" refers to the person against whom a complaint was filed—here, Plaintiff.

27

The preponderance of the evidence standard is an "expressly enumerated" right. *Doe 2019*, 2019 WL 2021026, at \*11, 2019 U.S. Dist. LEXIS 77580, at \*31. It is not, as the Syracuse Defendants argue, a "non-actionable statement of general policy" akin to a policy that students will be treated, for example, in a "fundamentally fair" manner. (Dkt. No. 28, at 10). While the Board's decision does, as the Syracuse Defendants note, state that the Board applied a preponderance of the evidence standard, and credibility determinations are for the Board, construing the allegations in the light most favorable to the Plaintiff, he has plausibly alleged that the disciplinary decision was a result-driven determination in which Syracuse failed to apply the applicable standard.

First, Plaintiff has alleged specific facts in support of his allegation that the credibility determinations against him and in favor of RP were not rationally based on the evidence. (Dkt. No. 1, ¶¶ 119–20, 151, 157–61, 169, 173–81, 190, 192, 193, 198, 210(d), 211). Specifically, Plaintiff alleges that Jacobson's report "assessed RP as credible," without addressing or considering RP's "multiple versions of events"; that Jacobson "disregarded and gave no account of inconsistencies in RP's statements"; and that the Board followed these findings, finding RP credible, even though its express findings reflect that she "made multiple untrue statements about her sex with Plaintiff," without any explanation of this discrepancy.  (*Id.* ¶¶ 119-120, 156-157, 169-172, 180; *see also* Dkt. 20-2, at 8 (Jacobson Report); Dkt. No. 20-2, at 41 (Board Opinion)). Furthermore, Plaintiff alleges that the investigation relied on "trauma informed techniques" that "turn unreliable evidence into its opposite," such that inconsistency in the alleged female victim's account . . . becomes evidence that her testimony is truthful."  (Dkt. No. 1, ¶ 89). Plaintiff, on the other hand, was found by the Board to be "lacking in credibility" because he, inter alia, acknowledged his sexual desire for RP and acknowledged that he "was still 'horny'

after she withdrew consent for kissing." (*Id.* ¶ 173; *see also* Dkt. No. 20-2, at 44 (Board Opinion)).

Second, Plaintiff further supports his claim with allegations that the pressure campaign led to bias against him. (Dkt. No. 1, ¶¶ 51–74, 191). Plaintiff has alleged specific facts in support of his assertion that there was a pressure campaign that resulted in Syracuse deciding to make Plaintiff "an example of Title IX enforcement," (*Id.* ¶¶ 51–74, 147, 191), including Syracuse's initiation of the complaint against him one day after the Office for Civil Rights' campus visit, which was over two months after RP's report. (*Id.* ¶¶ 74, 146, 211). Plaintiff has also alleged specific facts concerning the purported bias of individual Syracuse Defendants, including Jacobson and the Hearing Board's chair.[13] (*Id.* ¶¶ 75–99). Accordingly, construing all of the allegations in the light most favorable to Plaintiff, and at this preliminary stage of the proceedings, the Court finds Plaintiff has plausibly alleged that Syracuse breached its obligation to apply the preponderance of the evidence standard.

### D.     Breach of the Covenant of Good Faith and Fair Dealing (Fifth Cause of Action Against Syracuse Defendants)

Plaintiff alleges that the Syracuse Defendants breached the covenant of good faith and fair dealing. (*Id.* ¶¶ 233–40). The Syracuse Defendants argue that the claim should be dismissed because "New York law does not recognize a separate cause of action for breach of the implied covenant of good faith and fair dealing when a breach of contract claim, based on the same facts, is also pled." (Dkt. No. 20-6, at 20 (quoting *Yu v. Vassar Coll.*, 97 F. Supp. 3d 448, 482 (S.D.N.Y. 2015)). Plaintiff acknowledges that principle but argues that a party "may plead a claim for breach of the covenant of good faith and fair dealing in the alternative." (Dkt. No. 27,

---

[13] For instance, Plaintiff alleges that the chair, Carrie Grogan Abbott, closed an entire student television station in response to a complaint against a single show that "portrayed sensitive topics in a way that adversely affected women on campus" and "promoted male 'rape culture.'" (Dkt. No. 1, ¶ 76).

at 24–25) (quoting *Hard Rock Cafe Int'l, (USA), Inc. v. Hard Rock Hotel Holdings, LLC*, 808 F.

Supp. 2d 552, 567 (S.D.N.Y. 2011)).

As both parties recognize, New York law "does not recognize a separate cause of action

for breach of the implied covenant of good faith and fair dealing when a breach of contract

claim, based upon the same facts, is also pled." *Nungesser*, 169 F. Supp. 3d at 372–73 (quoting

*Yu*, 97 F. Supp. 3d at 482). A "breach of the implied covenant of good faith and fair dealing

claim that is duplicative of a breach of contract claim must be dismissed." *Id.* (quoting *Yu*, 97 F.

Supp. 3d at 482); *see also Cruz v. FXDirectDealer, LLC*, 720 F.3d 115, 125 (2d Cir. 2013)

("[W]hen a complaint alleges both a breach of contract and a breach of the implied covenant of

good faith and fair dealing based on the same facts, the latter claim should be dismissed as

redundant.").

A party may plead a claim for breach of the covenant of good faith and fair dealing in the

alternative; however, Plaintiff has not done so. Plaintiff's breach of contract and breach of the

implied covenant of good faith and fair dealing rest on the same allegations. Specifically,

Plaintiff realleges: investigatory bias, the failure to provide him with the No Contact Order, the

length of the investigation, the failure to apply a preponderance standard, and the failure to

provide sufficient notice of the charges against him. (*See* Dkt. No. 1, ¶¶ 236–38). Since each of

these allegations also underpinned Plaintiff's breach of contract claim, his claim for breach of the

implied covenant of good faith and fair dealing must be dismissed. *See Doe 2019*, 2019 WL

2021026, at *12, 2019 U.S. Dist. LEXIS 77580, at *34–35 (dismissing implied covenant of good

faith and fair dealing claim when "[a] close examination of the facts alleged . . . reveals that both

claims, at essence, arise from the same operative facts and seek the same damages"); *Nungesser*,

169 F. Supp. 3d at 373 (dismissing implied covenant of good faith and fair dealing claim when

the plaintiff "failed to plead any facts, separate from the facts with which he attempts to state a claim for breach of contract in support of his claim for a breach of the covenant of food faith and fair dealing"); *see also Keefe v. New York Law Sch.*, 71 A.D.3d 569, 570 (1st Dep't 2010) (noting that only a school's "specific promises" "can establish the existence of an implied contract," and "[a]bsent the existence of a contract, a claim alleging breach of the implied covenant of good faith and fair dealing is legally unavailing").

### E.   Negligence and Gross Negligence (Sixth and Seventh Causes of Action Against All Defendants)

Plaintiff alleges claims for negligence and gross negligence. (Dkt. No. 1, ¶¶ 241–255). To establish a prima facie case of negligence under New York law, a plaintiff must show: "(1) the defendant owed the plaintiff a cognizable duty of care; (2) the defendant breached that duty; and (3) the plaintiff suffered damage as a proximate result." *Noakes*, 369 F. Supp. 3d at 420 (quoting *Williams v. Utica Coll. of Syracuse Univ.*, 453 F.3d 112, 116 (2d Cir. 2006)). In addition to the elements required for negligence, a "claim for gross negligence will be sustained only if the plaintiff alleges facts plausibly suggesting that the defendant's conduct 'evinces a reckless disregard for the rights of others or smacks of intentional wrongdoing.'" *Bayerische Landesbank, N.Y. Branch v. Aladdin Capital Mgmt. LLC*, 692 F.3d 42, 61 (2d Cir. 2012) (quoting *M+J Savitt, Inc. v. Savitt*, No. 08-cv-8535, 2009 WL 691278, at *12, 2009 U.S. Dist. LEXIS 21321, at *37 (S.D.N.Y. Mar. 17, 2009)).

Plaintiff alleges that Syracuse owed Plaintiff a duty "to conduct its Title IX process with the care and diligence of a reasonable institution in its position," citing to Syracuse's obligations under Federal law, including the Clery Act, and the accreditation standards under the Middle States Commission on Higher Education. (Dkt. No. 1, at 62). Plaintiff asserts that Syracuse had a duty to keep him free from discrimination, citing to its "policies stating that it would protect

[Plaintiff] from discrimination on the basis of sex." (Dkt. No. 27, at 29-30). Plaintiff, however, has not cited to any New York law recognizing a duty of care owed by a private university stemming from its disciplinary proceedings. And, as Defendants argue, "New York State law does not recognize a claim for negligent investigation or prosecution." (Dkt. No. 20-6, at 21). *See Noakes*, 369 F. Supp. 3d at 421 (citing *Prasad v. Cornell Univ.*, No. 15-cv-322, 2016 WL 3212079, at *23, 2016 U.S. Dist. LEXIS 161297, at *74 (N.D.N.Y. Feb. 24, 2016)); *Yu*, 97 F. Supp. 3d at 484.

The Clery Act specifically states that it may not be construed to "(i) create a cause of action . . . for any civil liability; or (ii) establish any standard of care." 20 U.S.C. § 1092(f)(14)(A). *See supra* note 10; *Z.J.*, 355 F. Supp. 3d at 703 (rejecting claim of negligence based on the Clery Act). Courts in this Circuit have rejected the argument that the accreditation standards give rise to a duty of care for colleges or universities because there is no New York law "recogniz[ing] a duty of care arising out of accreditation standards." *Rolph v. Hobart & William Smith Colleges*, 271 F. Supp. 3d 386, 409 (W.D.N.Y. 2017); *Noakes*, 369 F. Supp. 3d at 421 (same).

Furthermore, Plaintiff's negligence allegations are similar to those underpinning his contract claim: that Syracuse "breached its duty (contract) with plaintiff to follow its own rules regarding student discipline." *Faiaz v. Colgate Univ.*, 64 F. Supp. 3d 336, 362 (N.D.N.Y. 2014) (dismissing negligence claim where "facts alleged in support of the plaintiff's negligence claim are similar to those alleged in connection with his contract claim-that the University breached its duty (contract) with plaintiff to follow its own rules regarding student discipline"). Plaintiff alleges that Defendants' negligent conduct stemmed from issuing the secret No Contact Order, dragging out the proceedings against him without cause, insufficient notice of the charges against

him, failing to apply the preponderance standard, and failing to provide fair and unbiased proceedings. (*See* Dkt. No. 1, ¶ 247). Each of these theories also underpins Plaintiff's breach of contract claim. Plaintiff's contract claim, however, cannot be transformed into a tort claim simply by alleging a duty of care. *Faiaz*, 64 F. Supp. 3d at 362. Having failed to establish that Syracuse owed Plaintiff a duty of care in connection with its investigation, Plaintiff's claims for negligence and gross negligence are dismissed.

### F.   Due Process Under Article I, Section 6 of the New York State Constitution (Eighth Cause of Action Against All Defendants)

Plaintiff alleges a due process violation under the New York State Constitution. (Dkt. No. 1, ¶¶ 256–69). Plaintiff alleges that the Syracuse Defendants became state actors for purposes of New York's Due Process Clause through Syracuse's implementation of Education Law Article 129-B, commonly known as the "Enough is Enough" Law. (*Id.* ¶ 258; Dkt. No. 27, at 27). Defendants argue that this is insufficient to establish state action. (Dkt. No. 20-6, at 22–23).

The Due Process Clause of the New York Constitution provides that "[n]o person shall be deprived of life, liberty or property without due process of law." N.Y. Const., art. I, § 6. To state a due process violation under the New York State Constitution, "a plaintiff must allege '[s]tate involvement in the objected to activity.'" *Doe 2019*, 2019 WL 2021026, at *8, 2019 U.S. Dist. LEXIS 77580, at *23 (quoting *Sharrock v. Dell Buick-Cadillac, Inc.*, 45 N.Y.2d 152, 160 (1978) (alteration in original)). The factors to consider in determining whether there is state action include: (1) "the source of authority for the private action"; (2) "whether the State is so entwined with the regulation of the private conduct as to constitute State activity"; (3) "whether there is meaningful State participation in the activity"; and (4) "whether there has been a delegation of what has traditionally been a State function to a private person." *Doe v. Harrison*, No. 03-cv-3943, 2006 WL 2109433, at *5, 2006 U.S. Dist. LEXIS 52058, at *15–16 (S.D.N.Y. July 28,

2006) (quoting *SHAD All. v. Smith Haven Mall*, 66 N.Y.2d 496, 505 (1985)). "Satisfaction of one of these criteria may not necessarily be determinative to a finding of State action." *Id.* (quoting *Sharrock*, 45 N.Y.2d at 158).

An allegation of state action "must include more than an obligation to follow, or adhere[] to, state law." *Doe 2019*, 2019 WL 2021026, at *9, 2019 U.S. Dist. LEXIS 77580, at *27. *Doe v. Skidmore College*, for instance, involved a New York State Article 78 proceeding in which a private university had revised its policy to comply with the Enough is Enough law. 152 A.D.3d 932, 933 (3d Dep't 2017). The court there rejected the student's "claims as to fundamental fairness" at a private university, noting that the university's "relationship with its students is essentially a private one such that, absent some showing of State involvement, [its] disciplinary proceedings do not implicate the full panoply of due process guarantees." *Id.* at 935 (quoting *Rensselaer Soc. of Eng'rs v. Rensselaer Polytechnic Inst.*, 260 A.D.2d 992, 994 (3d Dep't 1999)); *see also Jacobson v. Blaise*, 157 A.D.3d 1072, 1074 (3d Dep't 2018) (quoting Department of Education guidance which states that the process required by Enough is Enough "should not be read to extend to private colleges the constitutional due process rights that apply to public colleges"); *Kickertz v. New York Univ.*, 25 N.Y.3d 942, 944 (2015) ("A student subject to disciplinary action at a private educational institution is not entitled to the full panoply of due process rights.").[14]

Here, Plaintiff fails to allege sufficient state involvement in the disciplinary proceedings of Syracuse University, a private university, to support a due process claim under the New York

---

[14] As another court in the Northern District has noted, students at private universities are not without any procedural protections. "[S]chools within New York State must abide by the Enough is Enough law." *Doe 2019*, 2019 WL 2021026, at *9, 2019 U.S. Dist. LEXIS 77580, at *27. And private universities may provide students with rights above the minimum required by law. *Id.* (noting that "many" private universities "have chosen to provide students additional rights over and above the minimum required by law.").

Constitution. And "[w]ithout state involvement, plaintiff's state law due process claim fails," and must be dismissed. *Doe 2019*, 2019 WL 2021026, at *10, 2019 U.S. Dist. LEXIS 77580, at *28.

## V.     CONCLUSION

For these reasons, it is hereby

**ORDERED** that Defendants' Partial Motion to Dismiss under Fed. R. Civ. P. 12(b)(6) (Dkt. No. 20) is **GRANTED in part** and **DENIED in part**; and it is further

**ORDERED** that Defendants' Partial Motion to Dismiss (Dkt. No. 20) the Title IX claims (First, Second, and Third Causes of Action) as to the Defendant Board of Trustees is **GRANTED**, and those causes of action as to those defendants are **DISMISSED**; and it is further

**ORDERED** that Defendants' Partial Motion to Dismiss (Dkt. No. 20) the breach of contract claims (Fourth Cause of Action) is **GRANTED** as to the to the failure to provide Plaintiff a fair and unbiased proceeding and "written notice" or "adequate notice," but **DENIED** as to the failure to provide a written copy of the November 2016 No Contact Order; the failure to provide notice in writing of the charges filed against Plaintiff; the failure to apply a preponderance of the evidence standard; and the delay in the proceeding; and it is further

**ORDERED** that Defendants' Partial Motion to Dismiss (Dkt. No. 20) is **GRANTED** as to the implied covenant of good faith and fair dealing cause of action (Fifth Cause of Action); the negligence causes of action (Sixth and Seventh Causes of Action); and the Due Process Claim under the New York State Constitution (Eighth Cause of Action), and those causes of action are **DISMISSED**.

**IT IS SO ORDERED.**

Dated: February 21, 2020
       Syracuse, New York

Brenda K. Sannes
U.S. District Judge